[L. A. No. 24851.   In Bank.   May 27, 1958.]

EDWARD GONZALES, Petitioner, v. INDUSTRIAL
ACCIDENT COMMISSION et al., Respondents.

Levy, Russell & DeRoy and Jack P. Koszdin for Petitioner.

Edmund G. Brown, Attorney General, Irving H. Perluss, Assistant Attorney General, F. G. Girard and Henry K. Workman, Deputy Attorneys General, Everett A. Corten, Edward A. Sarkisian, Robert J. Calvert and Daniel C. Murphy for Respondents.

McCOMB, J.—Petitioner seeks annulment of a decision made by respondent Industrial Accident Commission denying him compensation from the Subsequent Injuries Fund of the State of California.

*Facts*: Petitioner is 42 years of age. He has been a deaf-mute since he was 5 years old, and he is unable to read lips.

He worked as a painter for a number of years prior to October 18, 1951, when he sustained an industrial injury to his back.

On December 3, 1952, the commission awarded him benefits for a 21½ per cent permanent partial disability for the injury. Contemporaneously, pursuant to section 4751 of the Labor

Code, a separate finding and award was made determining that the industrial injury was superimposed on the pre-existing deaf-mutism, resulting in a combined disability rating of 80 per cent, and an award was made against the Subsequent Injuries Fund of $7,020 plus a lifetime pension.

On March 13, 1956, the Subsequent Injuries Fund's petition to reopen the cause was granted.

On August 6, 1956, after a hearing, a referee made an order and award amending the previous finding of December 3, 1952, by increasing the rating for petitioner's combined disability from 80 per cent to 88 per cent.

On August 24, 1956, the Subsequent Injuries Fund filed its petition for reconsideration, which was granted, and the commission rerated petitioner's disability for deaf-mutism on the basis of 50 per cent of the standard rating for loss of speech and loss of hearing industrially caused. This resulted in a combined rating of 55¾ per cent, following which an order of the commission was filed October 10, 1956, directing that petitioner take nothing from the Subsequent Injuries Fund.

Thereafter, pursuant to petitioner's application, a further hearing was held to permit petitioner to cross-examine the rating expert, who testified, in substance, that he was instructed to issue a rating of 50 per cent of the standard schedule rating for loss of speech and for loss of hearing; that he did not take into consideration petitioner's inability to read lips; and that there was no rating for deaf-mutism as such in the rating schedule, but only ratings for loss of hearing and loss of speech separately.

On January 23, 1957, the commission affirmed its decision of October 10, 1956, that petitioner take nothing from the Subsequent Injuries Fund.

■ Petitioner contends:

First. *That the commission's decision of October 10, 1956, was made without affording him the right to cross-examine the rating expert and that he was thus denied his constitutional right of due process.*

This contention is devoid of merit under the facts in the present case. On October 3, 1956, after granting the petition of the Subsequent Injuries Fund for reconsideration, the commission requested from the rating bureau a recommended permanent disability rating on the basis of 50 per cent of the standard rating for loss of speech and loss of hearing.

On October 8, 1956, the commission gave notice that the report had been received from the rating bureau and that

the case would be submitted for decision seven days thereafter unless good cause was shown to the contrary. However, two days later, on October 10, 1956, the commission made its decision, after reconsideration, rerating petitioner's combined disability at less than 70 per cent.

Section 5704 of the Labor Code provides: ". . . copies of all reports and other matters added to the record, otherwise than during the course of an open hearing, shall be served upon the parties to the proceeding, and an opportunity shall be given to produce evidence in explanation or rebuttal thereof before decision is rendered." Commission Rule No. 10929 provides: "After the Permanent Disability Rating Bureau has prepared the recommended rating and the rating specialist has signed it, it shall be returned to the person requesting the recommended rating, who shall thereupon cause it to be served on all interested parties, together with a notice that the case will be submitted for decision seven days after the date of service, unless good cause to the contrary is shown in writing prior thereto."

In making its decision on October 10, 1956, the commission did not accord petitioner the required seven days within which to object to the recommended rating or to request a hearing for the purpose of cross-examining the rating expert. It is settled that the denial of such a right of cross-examination is a denial of due process. (*Pacific Employers Ins. Co.* v. *Industrial Acc. Com.*, 47 Cal.App.2d 713, 715 [118 P.2d 848]; *Walker Min. Co.* v. *Industrial Acc. Com.*, 35 Cal.App.2d 257, 262 [95 P.2d 188] [hearing denied by the Supreme Court].) However, in the present case the commission granted petitioner's application for reconsideration, and he was afforded a hearing to cross-examine the rating expert, following which the commission reaffirmed its order of October 10, 1956. Thus, petitioner, having been afforded an opportunity of cross-examination at the subsequent hearing, was not denied due process in the instant case. (*Walsh* v. *Industrial Acc. Com.*, 1 Cal.2d 747, 748 [1] [36 P.2d 1072].)

Second. *That the commission was without jurisdiction to make the order of January 23, 1957, since more than five years had elapsed after the injury occurred.*

This contention is likewise devoid of merit. Section 5804 of the Labor Code provides that no award of compensation shall be rescinded, altered, or amended after five years from the date of the injury. In the instant case, the injury occurred on October 18, 1951. The Subsequent Injuries Fund

filed its petition to reopen on March 13, 1956, and on August 6, 1956, an order was made by the referee amending the finding and award, all within five years from the date of the injury.

Section 5900 of the Labor Code provides, in substance, that any person aggrieved by a final order, decision, or award made and filed by a commissioner or referee may petition the commission for reconsideration in respect to any matters determined or covered thereby.

Section 5903 of the Labor Code provides that a petition for reconsideration may be filed at any time within 20 days after the service of any final order, decision, or award upon any of the grounds therein specified.

Sections 5900 and 5903 are parts of chapter 7, entitled "Reconsideration and Judicial Review," of part 4 of division 4.

In the present case, respondent Subsequent Injuries Fund filed its petition for reconsideration within 20 days after the referee's amended findings and within five years from the date of injury. This petition for reconsideration was filed pursuant to the provisions of section 5900, and the final order of the commission made on January 23, 1957, which was more than five years from the date of the injury, related solely to the proceedings for reconsideration under chapter 7.

*Sutton* v. *Industrial Acc. Com.,* 46 Cal.2d 791 [298 P.2d 857], relied on by petitioner, is not here in point. That case expressly points out, at page 795, that sections 5803 and 5804 of the Labor Code applied to the proceedings there under consideration and that the five-year limitation within which the commission may amend or rescind an award is fixed by section 5804 of the Labor Code. There is no provision in chapter 7, dealing with proceedings for reconsideration and judicial review, limiting the time within which the commission may make its decision on reconsideration, and in the absence of a statutory limitation none will be implied.

Third. *That the decision of the commission in rating his deaf-mutism at 50 per cent of the standard rating is not sustained by the evidence and is unreasonable and arbitrary.*

This contention is untenable.

■ (1) Findings of the Industrial Accident Commission are not subject to review on the ground that there is no substantial evidence to sustain them, except insofar as it may appear that they have been made without *any* evidence whatever in their support. (*Douglas Aircraft, Inc.* v. *Industrial Acc. Com.,* 47 Cal.2d 903, 905 [2] [306 P.2d 425].)

■ (2) It is error to rate a congenital condition of deaf-mutism to which petitioner has so far adjusted himself as to be reasonably employable after the injury as well as before by the same standard that it would have been rated if petitioner had lost his hearing and speech in the same accident in which he received the industrial injury. (*State* v. *Industrial Acc. Com.*, 129 Cal.App.2d 302, 304 [1] [276 P.2d 820] [hearing denied by the Supreme Court].) Petitioner's disability would have been much greater if he had had the normal faculties of speech and hearing up to the time of the accident and had lost them then, with the whole period of adjustment to their loss before him, than it could possibly have been with the whole period of adjustment to their lack behind him.

■ In the instant case, the record discloses that petitioner had been a deaf-mute from the age of 5 years and was unable to read lips; that he had learned the painting trade when he was 14; that he had been a prize fighter and an aircraft worker during the war; and that in 1944 he joined the painters' union and had worked steadily from that time until the accident. It further discloses that since his recovery he has worked as steadily as any other member of the painters' union.

Therefore, the commission properly reasoned that petitioner had lived with his condition all of his life and that there was no showing that the industrially-caused injury would force him to change his occupation, in which case his congenital deaf-mutism might be a greater handicap.[1] The commission thus concluded that since the lowered rating, added to the percentage of total disability resulting from the industrial accident, did not equal the 70 per cent required by section 4751 of the Labor Code,[2] petitioner was not entitled to additional benefits from the Subsequent Injuries Fund.

---

[1] For an excellent discussion of the concept of permanent disability under the California plan and the reasoning in support of the variable factors taken into account thereunder, see ''Variable Factors in Permanent Disability Rating, With Particular Reference to the Inclusion of Age and Occupation,'' by R. E. Haggard, Supervisor, Permanent Disability Rating Bureau, vol. 2, Appendix to Journal of the Senate, California Regular Session, 1951, page 101 of Partial Report of Senate Interim Committee to the Senate on Workmen's Compensation Benefits.

[2] Section 4751 of the Labor Code reads as follows: ''If an employee who is permanently partially disabled receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree of disability caused by the combination of both disabilities is greater than that which would have resulted from the subsequent injury alone, and the combined effect of the last injury and the previous dis-

Since the evidence sustains the finding of the commission, under rule (1), *supra,* such finding is binding upon this court.

In *State* v. *Industrial Acc. Com., supra,* a case almost identical in its facts with the present case, an order of the Industrial Accident Commission awarding recovery against the Subsequent Injuries Fund was annulled when the commission, without taking evidence on the question, had applied its rating for industrially-caused deaf-mutism to a case involving congenital deaf-mutism. The court in such case indicated the correct procedure as that set forth under rule (2), *supra.* In the present case, the commission, in following this rule, concluded that deaf-mutism did not seriously affect petitioner's ability to be a painter and that he had adjusted well to his condition. There is thus sufficient evidence in the record to support its finding.

The award is affirmed.

Shenk, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority concludes that there is some evidence to support the commission's percentage rating of petitioner's disability. I am constrained to disagree. Moreover, the effect of the majority holding is to defeat the principle that dictates that there be uniformity in awards for the same injury, which principle forms the basis of the theory upon which the rating schedules are based.

The problem in this case is to compute a disability rating for loss of speech and hearing sustained at age 5 on the basis of a rating schedule designed for determining the permanent disability rating of a painter who sustains loss of speech and hearing at age 40.

No intelligent use of such a schedule is possible until a common denominator is established between the rating schedule and the disability to be rated. It is not enough that the

---

ability or impairment is a permanent disability equal to 70 percent or more of total, he shall be paid in addition to the compensation due under this code for the permanent partial disability caused by the last injury, compensation for the remainder of the combined permanent disability existing after the last injury as provided in this article; provided, that either (a) the previous disability or impairment affected a hand, an arm, a foot, a leg, or an eye, and the permanent disability resulting from the subsequent injury affects the opposite and corresubsequent injury, when considered alone and without regard to the sponding member, or (b) the permanent disability resulting from the age of the employee, is equal to 40 percent or more of total.''

disability to be rated and the occupation involved are identical with those appearing in the schedule. The schedule is predicated upon the assumption that the age, injury and claim for compensation are contemporaneous. In this case the claim for compensation, and hence the age, occurs at a time separate from the time of injury. This difference prevents the use of the schedule until the significance of the difference is analyzed to determine whether it compels a deviation from the percentage ascribed to such injury in the rating schedule. This involves an examination of the rating schedule, the factors considered in preparing the schedule and what it is designed to compensate.

The law provides that where an employee with a preexisting known permanent disability receives a subsequent industrial injury which is independent in its effects and does not aggravate the preexisting permanent disability, but which results in additional permanent disability, the subsequent injuries fund is liable for the combined effect of the injuries if they equal a permanent disability rating of 70 per cent or more of total disability (Lab. Code, § 4751). Having created the need for determining the percentage of permanent disability to total disability, the law also, by section 4660 of the Labor Code, prescribes how it is to be computed.

Section 4660, subdivision (b) of the Labor Code authorizes the preparation of "a schedule for the determination of the percentage of permanent disabilities in accordance with this section." The schedule prepared contains lists of particular injuries to which all injuries may be related, and a list of the more frequently found occupations. These two lists are correlated by means of tables. In addition there are a series of rating tables to correlate the relative severity of an injury with the age of the employee at the time of injury. Percentage values are assigned to each injury and through the use of the tables these percentages are adapted to any given injury.

In arriving at the value of the percentages for each listed injury the architects of the schedule take into consideration the nature of the disability as modified by age and occupation with consideration given to ability to compete in an open labor market. (See Lab. Code, § 4660, subd. [a]; vol. 2, Appendix to Journal of the Senate, California Regular Session, 1951, p. 58 of Partial Report of Senate Interim Committee to the Senate on Workmen's Compensation Benefits [hereinafter 1951 Partial Report].) Of course, the percentage of

permanent disability resulting from an injury does not depend entirely on the nature of the disability. Moreover, there are other factors than those of age and occupation entering into consideration, such as the make-up of the man, his desire to recover and his inherent adaptability. However, all of these things affect the individual only and are not capable of objective measurement or determination (1951 Partial Report, *supra,* 103). As a result only those factors described in section 4660, subdivision (a) of the Labor Code are considered in ascertaining the percentage of disability to attribute to a particular injury. The percentage ratings so specified are considered adequate on the average to compensate for the residual physical disability resulting from the injury and to afford a reasonable period of accommodation to the effect of such injury. (1951 Partial Report, *supra,* 68.)

This system of disability rating is called the ''standard measure for determining percentage of disability to total disability.'' (1951 Partial Report, *supra,* 59.) The reason justifying such standardization is that it makes it possible to obtain uniform evaluation for identical disabilities, avoid unnecessary litigation, and reduce the cost thereof and expedite the promptness of evaluation (1951 Partial Report, *supra,* 69).

It is through the disability rating schedule that the theory behind the compensation of employees for industrial injuries is implemented. This theory is termed the theory of rehabilitation. It assumes that a permanently injured employee either can or cannot regain his earning capacity and if he cannot he must be pensioned for life. If he can, he must be aided financially during the period of rehabilitation. Where rehabilitation to gainful employment is possible the amount of compensation is obviously contingent upon whether the injury will prevent the employee from assuming his former occupation, and thus, require the development of a new occupational skill, or if he can resume his former job, whether there is any loss of past proficiency and expected potential (see 1951 Partial Report, *supra,* 102). To illustrate, a bookkeeper who has lost his leg can return to his former work completely rehabilitated in a short time, while the structural iron worker who loses his leg is forever barred from following his former occupation. In the latter case, then, the percentage of disability to total disability would be greater than in the former case, since the rehabilitation period would be more extensive. Therefore, in each case the accuracy and proper

application of the percentages appearing in the disability schedule must be measured according to the general considerations which prompt the rehabilitation percentage value; that is, must the employee develop a new skill, and if not, what is the extent of the loss of past proficiency and expected potential.

If the principle of uniformity of compensation for the same injury is adhered to, it is only differences in the extent of rehabilitation which can justify a deviation from the percentage assigned an injury in the schedule.

With the revelation of the factors which permit the assignment of a different percentage from that appearing in the schedule, it is now possible to compare the percentage value of the schedule based on age forty with the injury herein, and thus arrive at a percentage of disability for an employee now forty, but who lost his speech and hearing at age five. The basis of comparison is the extent of rehabilitation required. The disability is rated first in accordance with the regularly adopted schedule and then adjusted downward or upward, or possibly with no change at all depending upon the differences in rehabilitation (see *Springer* v. *Subsequent Injuries Fund*, 21 C.C.C. 335, 342).

The method of accomplishing this comparison is by hearing evidence, and with all the facts consult the disability schedule, computing a rating which will be in accord with the rehabilitation principle of the schedule. This is true regardless of whether the percentage is to be adapted to a case such as the one now before us (see *State* v. *Industrial Acc. Com.*, 129 Cal.App.2d 302 [276 P.2d 820]) or if the rating is for unscheduled injuries (see 1951 Partial Report, *supra*, 58-59).

If it is correct that the sole basis of comparison between the disability schedule and the particular injury involved herein is the extent of rehabilitation required, then it must follow that the only relevant evidence on such issue is evidence that tends to show similarity or dissimilarity between the rehabilitation required in each instance.

The only evidence presented on this issue came from two of petitioner's witnesses, both of whom qualified as experts in the rehabilitation of deaf-mutes for gainful employment. The witnesses agreed that loss of speech and hearing at age 40 would pose no particular difficulty in an employee's ability to paint. Such a disabled employee could paint as well after the injury as he did before. The main problem would be placement of the worker, and its solution depends on how well

the employee could communicate to others and understand in some manner another's directions. It was noted that even assuming placement was possible the injured employee's problem would remain communication. In other words to rehabilitate a deaf-mute painter implies that he has some means of communication, and the better he can communicate the more complete the rehabilitation.

Without contradiction the experts concurred in the opinion that lip reading was the most desirable type of communication. It constituted the greatest degree of rehabilitation.

Having established that rehabilitation of a deaf-mute means learning to communicate, witness Becker testified unequivocally and without dispute that a person who becomes a deaf-mute at age 5 is not in as good a position for gainful employment and advancement in an occupation as the person who becomes a deaf-mute at age 40, except in individual cases. The reason being that a person who becomes a deaf-mute at an early age never makes the same adjustment as one who becomes a deaf-mute at age 40. A person who could hear before would have a better chance to go on, whereas the person who is a deaf-mute at age 5 is still fighting the language barrier. He cannot express himself in writing or otherwise as well as one who acquires the loss later. The one who acquires the disability at age 40 can build speech and lip reading more quickly because he has a memory of speech and sound. It is fair to state that a man who became a deaf-mute at age 40 would get along better, or at least as well as one who incurred the disability at age 5.

Witness Jonas' testimony was substantially in accord with Becker. However, he did state that a person who became a deaf-mute at age 40 might have greater disability for a short time while he is making an adjustment to his mental problem, but he would not have greater disability in his vocational problem because he has a greater ability to read and write. Since the rehabilitation here involved pertains to a return to gainful employment the mental aspect is not relevant.

The conclusions to be drawn from this testimony are self-evident. It would appear that Gonzales' disability rating can be no less than that of a man incurring the injury at 40.

The evidence upon which the majority relies to uphold the panel's finding is irrelevant and immaterial to the issue of a comparison between the rehabilitation problems of a man who incurs loss of speech and hearing at age 40 and a man age 40 who incurred a similar injury at age 5. This evidence reads

as follows: "... petitioner had been a deaf-mute from the age of five years and was unable to read lips; that he. had learned the painting trade when he was 14; that he had been a prize fighter and an aircraft worker during the war; and that in 1944 he joined the painters' union and had worked steadily from that time until the accident. It further discloses that since his recovery he has worked as steadily as any other member of the painters' union." Although it is not entirely clear, the majority apparently utilizes this evidence to demonstrate that Gonzales is rehabilitated to a greater degree in comparison to a man who at 40 becomes a deaf-mute. If I have correctly perceived the use of this evidence then it is patently clear that the use of it by the majority is incorrect. In fact the evidence is not a comparison at all, but merely the biographical facts of Gonzales' life. By themselves they are no more significant than anyone else's past employment history.

The essential element to be established is whether Gonzales has been vocationally rehabilitated to a greater degree than an employee who lost his speech and hearing at age 40. The evidence used by the majority is only probative on this point if we accept the premise that because a deaf-mute has had 40 years to adjust to his disability he has accomplished greater rehabilitation than one who at age 40 incurs such a disability. According to the uncontradicted expert testimony in this case the premise is false. Quite unfortunately it was first propounded in *State* v. *Industrial Acc. Com., supra.* At the time it was made there was no basis in the record for such a conclusion. Upon remand of the case to the commission it appeared that the premise was to be buried after expert evidence had refuted the truth of it (*Springer* v. *Subsequent Injuries Fund, supra,* 338). The expert evidence in that case was substantially the same as the expert testimony herein. Thus, the attempt by the majority to resurrect this premise leads to an untoward and ill-advised result, and it should be scrapped for the same reason it was in *Springer* v. *Subsequent Injuries Fund, supra.*

If the evidence upon which the majority relies is to have any relevance at all, it must be to show that Gonzales is an exceptional individual with better powers of adjustment than the average person incurring such disability at age 40. Such proof would then justify a deviation from the disability schedule which is based upon the average individual and be in keeping with the expert testimony which likewise was phrased

in terms of the average. However, here again the evidence is not susceptible to such an inference. In order to show that Gonzales is exceptional there must be either a comparison with an average person, or a demonstration that his past actions are so remarkable that he may be called exceptional. Since the record is devoid of any evidence of a comparison, this ground cannot form the basis for a finding that Gonzales was exceptional. We do know that Gonzales, in addition to being a painter, was a prize fighter and aircraft worker. But this evidence, without more, does not tell us that he was exceptional. He could have been inept in all fields. In view of the false premise that was unwisely announced in *State* v. *Industrial Acc. Com., supra,* we should remain circumspect in making any such assumptions from the history of past employment without any elaboration in the record to support it.

Fortunately we need not rely on lack of evidence to prove irrelevance, for there is affirmative, uncontradicted evidence that shows Gonzales is no more than average. This evidence is the fact that Gonzales cannot lip read. It is true that past acts do show some measure of adjustment, at present he can at least hold a position, but the experts all agree that the failure to lip read will always prevent rehabilitation to the degree one may attain if the injury is incurred at age 40.

The error of the majority is that it equates the length of time since the injury with vocational adjustment. One does not necessarily follow from the other. It is not time that promises proficiency, but the dimension of the disability.

Moreover, if the majority opinion is allowed to stand it will undermine the theory supporting a uniform disability schedule. In the Springer case, which the majority concedes is factually indistinguishable from the instant case, an award against the subsequent injuries fund was upheld (21 C.C.C. 335, 337). If this is correct, then what rational basis can there be for not allowing an award here? If the principle of uniformity in awards for the same injury is to have any efficacy the result in the Springer case should be followed.

For the foregoing reasons I would annul the decision of the commission and remand the proceeding.

Gibson, C. J., and Traynor, J., concurred.

Petitioner's application for a rehearing was denied June 25, 1958. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the application should be granted.