[Civ. No. 21520.   First Dist., Div. One.   April 3, 1964.]

SUBSEQUENT INJURIES FUND, Petitioner, v. IN-
DUSTRIAL ACCIDENT COMMISSION, JOHN D.
ROGERS et al., Respondents.

138

Stanley Mosk, Attorney General, B. Franklin Walker and J. L. Henderson, Jr., Deputy Attorneys General, for Petitioner.

Everett A. Corten, Rupert A. Pedrin, Charles P. Scully and Lowell A. Airola for Respondents.

SULLIVAN, J.—Petitioner Subsequent Injuries Fund of the State of California, hereafter referred to as the Fund, seeks the annulment of an award made against it by respondent Industrial Accident Commission in favor of respondent John D. Rogers.

On August 31, 1959, Rogers sustained an industrial injury to his back, neck and head while employed as an attorney for the State of California, Department of Public Works, Division of Contracts and Rights of Way. At such time he was also suffering from two preexisting nonindustrial disabilities: (1) a below the knee amputation of the left leg occurring in 1944 as a result of an injury in the armed service; and (2) a total loss of hearing in the left ear congenital in nature. On January 9, 1961, Rogers filed an application with the commission seeking not only a determination of liability for temporary and permanent disability and for medical treatment

but also additional subsequent injuries benefits from the Fund based on his preexisting disabilities.[1]

Thereafter the commission issued findings and award determining that the injury caused permanent disability but no compensable temporary disability, that applicant might need further medical treatment and that the Fund had no liability upon the evidence. Accordingly the commission made an award of medical benefits in applicant's favor against the employer's carrier. The foregoing findings and award were grounded on a permanent disability rating of 32 per cent (reduced from 40 per cent after modification for age and occupation) which was based on disability factors described as follows in the referee's request for a rating: "Disability in back, head, neck, limiting applicant to light to moderate work." Since the rating of 32 per cent was less than the minimum disability of 40 per cent prescribed by the statute governing subsequent injuries benefits as in effect at the date of the injury, liability for such benefits did not attach to the Fund.[2]

Rogers thereupon filed a petition for reconsideration alleging that the evidence justified a much higher rating, that the rating was based on a "conclusionary type description" and that a more complete and detailed description of the factors of disability was required. Applicant's petition was granted

[1]Rogers' employer was insured by State Compensation Insurance Fund, also named respondent herein. However the employer's carrier has not sought herein an annulment of the ensuing award made against it for medical treatment and normal compensation benefits.

[2]Labor Code section 4751 as in effect on August 31, 1959, provided: "If an employee who is *permanently* partially disabled receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree of disability caused by the combination of both disabilities is greater than that which would have resulted from the subsequent injury alone, and the combined effect of the last injury and the *previous disability* or *impairment* is a *permanent* disability equal to 70 percent or more of total, he shall be paid in addition to the compensation due under this code for the permanent partial disability caused by the last injury, compensation for the remainder of the combined *permanent* disability existing after the last injury as provided in this article; provided, that either (a) the previous disability or impairment affected a hand, an arm, a foot, a leg, or an eye, and the permanent disability resulting from the subsequent injury affects the opposite and corresponding member, or (b) the permanent disability resulting from the subsequent injury, when considered alone and without regard to the age of the employee, *is equal to 40 per cent or more of total*." (Italics added.)

and Panel One of the commission thereupon submitted a more detailed description of the factors of disability together with a request for a rating.[3]

Pursuant to above request and description, the rating bureau of the commission recommended the following ratings: (a) For the neck, spine and back disability 32 per cent (reduced from a standard 40 per cent); for the head disability 15 per cent (increased from a standard 10 per cent). These two ratings totaling 47 per cent were reduced to 43¾ per cent by application of a multiple disability rating table. (b) For the left lower leg disability 46 per cent; and for the hearing loss 13 per cent. The total of the above percentages, 102¾ per cent (43¾ per cent plus 59 per cent) was thereafter reduced to 77¾ per cent by application of the multiple disability rating table. The 43¾ per cent rating for the industrial injury was then deducted from the total disability rating of 77¾ per cent, to arrive at a difference of 34 per cent representing the preexisting disability chargeable to the Fund.

Petitioner requested that the case be set for further hearing to give it an opportunity to cross-examine the rating specialist. At the ensuing hearing, the rating specialist testified that he rated the head disability separately from the neck, spine and back disability; that he rated the back disability in the light of the direction that applicant was "limited to light to slightly moderate work"; that if instead of being separated into two paragraphs (see footnote 3, *ante*) the factors of disability for the head, neck, spine and back were set forth in one paragraph, the recommended rating would be a standard rating of 40 per cent; but that both the headache factors of disability and the back factors of disability were separately stated in the rating schedule. The witness further testified over objection of applicant's counsel that when rating the preexisting disabilities he did not consider any factor of rehabilitation possibly undergone by the applicant and that therefore he rated both the leg disability and the ear disability as if they had occurred on August 31, 1959,

[3]This description consisted of four paragraphs, the first two pertaining to the industrial disability and the last two to the preexisting disability. The first paragraph pertained to the head disability, the second to the neck, spine and back disability, the third to the left leg amputation and condition of the stump, and the fourth to total loss of hearing in left ear.

the date of the industrial injury.[4] He also explained the 46 per cent rating of the left lower leg disability as follows: The loss of the left leg below the knee was given a standard rating of 50 per cent, modified for the applicant's age and occupation to 41 per cent. To this was added a combined rating of 5 per cent for the swelling and drainage of the stump and the occasional slight to moderate pain, making a total of 46 per cent.

Eventually the commission issued an amended decision after reconsideration making an award in favor of the applicant and against the employer's insurance carrier for permanent disability indemnity (based on a permanent disability rating of 43¾ per cent), medical treatment and medical expenses and also making an award in favor of the applicant and against the Fund for subsequent injuries benefits, based on an assessed liability of 34 per cent (i.e., a total permanent disability of 77¾ per cent less the above 43¾ per cent).

The Fund contends that (1) a portion of the permanent disability award was for a condition which was temporary rather than permanent; (2) a portion of the award against the Fund was for a disability that did not preexist the industrial injury; (3) the commission should have adjusted its ratings of preexisting disabilities to reflect prior rehabilitation; and (4) the commission's rating of the industrial disabilities was an unwarranted pyramiding of compensation.

Petitioner's first two contentions relate to the 5 per cent rating included in the total rating of 46 per cent for the applicant's left lower leg disability, as already explained above. In the second and more detailed request for a permanent disability rating, these factors of disability were described thusly: "... recurrent swelling at stump, which breaks open and drains; occasional slight to moderate pain from time to time." It was these two factors in combination to which the rating specialist ascribed a rating of 5 per cent. Under its first contention the Fund argues that the condition of swelling and drainage was temporary rather than permanent. At the inception of the proceedings before us, the Fund took the position that the foregoing was the extent of its argument on this point and that it was not arguing that the swelling with drainage did not preexist the industrial injury.

---

[4]The referee permitted the answer observing that in any event the rating specialist "has the schedule and that is as far as raters are entitled to go."

However at oral argument the Fund maintained that the above described condition was not preexisting. Under its second contention, the Fund argues that the pain as described above did not preexist the industrial injury.

The point of petitioner's first two contentions is this: Labor Code section 4751 (see footnote 2, *ante*) imposes liability on the Fund only for *permanent preexisting* disabilities. The first condition of recurrent swelling and drainage, says the Fund, was neither permanent nor preexisting. The second condition of pain was not preexisting.

The record discloses the following pertinent evidence: The applicant testified that after wearing the prosthesis for six months, he "had no difficulty with the stump or the prosthesis"; that for the ensuing period of approximately 15 years until his accident on August 31, 1959, he lost no work on account of his first injury; and that although sometimes after walking "there would be a redness or roughness on the stump but never any disorder," there never had been any drainage in the stump prior to the subsequent injury. It is to be noted that he neither expressly affirmed nor denied the existence of pain in the stump area prior to the subsequent injury. The record shows that intermittent drainage was first observed about three weeks after the 1959 injury; that over the next several months there was a continuous process of swelling and drainage in the stump area; that acting on the advice of his physician, Dr. Maloney, applicant in July 1960 underwent an operation to correct this condition; but that, nevertheless, approximately six weeks later, the condition recurred.

Dr. Lewis, who originally examined the applicant in November 1959, reexamined him on July 3, 1961, chiefly for the purpose of evaluating complaints of stump disability. This reexamination was approximately one year after the operation performed by Dr. Maloney and 22 months after the second injury. Dr. Lewis concluded in his medical report that the condition resulted from a cyst of the type common on amputation stumps.[5] Dr. Haldeman who examined the appli-

[5] Dr. Lewis' report in relevant part states: "I have not seen the pathological report of what Dr. Maloney removed from the stump. However, on the basis of the patient's history and from seeing similar cases, it appears to me probable that it was a subcutaneous sebaceous type of cyst which broke down, became fluctuant, and drained. Cysts of this type are very common on amputation stumps. This patient has two such cysts adjacent to the operative area on his stump at the present

cant on February 12, 1962, one week before the hearing, stated that the applicant then complained of intermittent drainage from the stump of the left leg.

Dr. Hedburg, who examined the applicant on February 1, 1962, also found the same complaint, noting in his medical report that "There were no episodes of inflammation or breaking down in the stump tissues at any time prior to the injury in question." After remarking that there were "varying speculative opinions concerning etiology" by other doctors, Dr. Hedburg's report continued: "I am not fully able to resolve this conflict of opinion on the basis of available information. The stated fact that there had never been any similar inflammatory process during the previous fifteen years or more is not necessarily conclusive but deserves consideration. ... I would strongly suspect that a low grade infection of the periosteum or cortex of the distal stump of the fibula is responsible for the recurring drainage and it should be possible to clear up the situation once and for all by an appropriate surgical procedure designed to remove the focus of infection as well as the sinus tract." Petitioner relies on the last clause quoted above as strongly indicative of the temporary character of the recurrent swelling and drainage.

In our view, the foregoing evidence is supportive of the commission's determination that the two conditions presently under discussion and rated at 5 per cent were permanent in nature and preexisted the industrial injury.

The applicable statutes provide no definition of permanent disability. ■ However it is now settled that a disability is permanent within the meaning of the Workmen's Compensation Law when further change for better or for worse is not reasonably to be anticipated under usual medical standards. Either no further medical treatment is possible or the success of that which is suggested is so problematical as to warrant refusal to undergo it. ■ Generally speaking a permanent disability is one which will remain substantially the same during the remainder of the injured party's life. (*Sweeney* v. *Industrial Acc. Com.* (1951) 107 Cal.App.2d 155, 159 [236 P.2d 651] quoting from 1 Campbell, Workmen's Compensa-

---

time. However, these other cysts are firm and have not broken down. They may in the future. I personally do not see how the patient's accident could have had any bearing on the development of stump cysts one way or the other."

tion, § 813, p. 719.) According to Hanna (2 Hanna, The Law of Employee Injuries and Workmen's Compensation (1954 ed.) p. 255) ''Permanent disability may be defined as any impairment of bodily or mental function which remains after maximum recovery has been attained from the effects of injury, and which causes impairment of earning capacity, impairment of the normal use of a member, or a competitive handicap in the open labor market.'' ▮ Whether an injury is permanent is purely a question of fact for the determination of the commission which is final and conclusive on said issue if supported by any substantial evidence. (*Pullman Co.* v. *Industrial Acc. Com.* (1946) 28 Cal.2d 379, 385-386 [170 P.2d 10]; *Hart* v. *Industrial Acc. Com.* (1931) 119 Cal.App. 200, 202 [6 P.2d 348]; *County of Los Angeles* v. *Industrial Acc. Com.* (1936) 14 Cal.App.2d 134, 137 [57 P.2d 1341]; *Sweeney* v. *Industrial Acc. Com., supra.*)

▮ In the instant case, the evidence shows that the condition of recurrent swelling and drainage in the stump still existed approximately two years and five months after the industrial injury of August 1959 and approximately one year and a half after applicant's operation. This period of time, especially when considered with the attempted operative procedure, was sufficiently long so as to warrant the commission's determination that the condition was permanent. (Cf. *Hart* v. *Industrial Acc. Com., supra,* 119 Cal.App. 200, 202.) Dr. Hedburg's report on which the Fund relies does not compel a different conclusion. He stated therein his inability to resolve the medical opinion as to the cause of the condition, his *strong suspicion* as to the cause and his opinion that it should be *possible* to clear it up. That portion of the statement relevant to the clearing up of the condition, when considered in context, is actually susceptible of two inferences —one, that it is *possible* to clear up the condition and the other, that it is *not* possible to do so. (Cf. *Sweeney* v. *Industrial Acc. Com., supra,* 107 Cal.App.2d 155, 159.) The commission chose to adopt the latter inference. In support of its claim that the condition was merely temporary, the Fund also adverts to the applicant's testimony that he intended to have further treatment including another operation. ▮ But the need for further medical treatment is not incompatible with the status of permanent disability. (*Industrial Indemnity Exchange* v. *Industrial Acc. Com.* (1949) 90 Cal.App.2d 99, 102 [202 P.2d 850]; *Hart* v. *Industrial Acc. Com., supra,* 119 Cal.App. 200, 202.) ▮ We believe

therefore that the permanent character of the condition relating to the recurrent swelling and drainage has sufficient support in the record.

However, we must inquire whether the record also supports the determination that this condition *preexisted* the industrial injury before it can be considered as a properly rateable factor of permanent disability for purposes of subsequent injuries benefits. (Lab. Code, § 4751; *Ferguson* v. *Industrial Acc. Com.* (1958) 50 Cal.2d 469, 474, 479 [326 P.2d 145].) The commission argues that such evidentiary support is found in that portion of Dr. Lewis' medical report quoted by us above (see footnote 5, *ante*). We think this argument has merit. The above report in substance states that what Dr. Maloney removed from the stump in the operation of July 1960 was a cyst which had broken down and drained. It will be recalled that this drainage was first observed only three weeks after the industrial injury. Dr. Lewis further stated that ''Cysts of this type are very common on amputation stumps,'' that at the time of his examination of the applicant in July 1961 (one year after the first operation) he found two more cysts which had not yet broken down, and that the industrial injury had no bearing on the development of stump cysts. From this evidence the commission was justified in inferring that the cyst, the drainage of which was first observed shortly after the industrial injury, was an old cyst which preexisted the injury.[6]

While the applicant testified that there was never any drainage in the stump prior to the industrial injury, this would not negate the existence of the old cyst which later drained. Nor does his testimony that he lost no work on account of the first injury preclude consideration of the condition as a factor of permanent disability. Where a factor of permanent disability preexists the industrial injury and otherwise supports an award of permanent disability, it is not necessary that it must have been known to the employee or that it must have interfered with his employment in his particular field of work in order for such disability to ground an award of subsequent injuries benefits. (*Subsequent In-*

---

[6]It is to be noted that Dr. Hedburg similarly evaluates Dr. Lewis' report, stating: ''Dr. Lewis, however, came to the conclusion that the lesion was the result of breaking down of an old sebaceous cyst having no relation to the injury in question.''

*juries Fund* v. *Industrial Acc. Com.* (1961) 56 Cal.2d 842, 846 [17 Cal.Rptr. 144, 366 P.2d 496].)

■ This brings us to the second part of the problem: namely, whether the factor of pain described above pre-existed the industrial injury. The applicant, testifying to the condition of drainage as it developed *after* the industrial injury, stated that the area was painful while the pressure was building up, that such pain was felt when he was ''standing on the stump'' but not when he had removed the prosthesis. Dr. Hedburg's report, also speaking as of a time subsequent to the industrial injury, appears to confirm the attendance of pain upon the cyst indicating under the heading of subjective complaints that a tender lump increased in size and that before it burst walking became difficult because of the pressure. Accordingly we think that the commission could reasonably infer, as it now claims, that pain was a concomitant of the preexisting cyst.

The Fund argues that this inference cannot be drawn since the complaint, being subjective, by its very nature could not have existed without the applicant's knowledge and that the applicant testified to the absence of complaints referrable to the left lower extremity before the industrial injury and the inception of such complaints with the industrial injury. However, as we read the record, the applicant did not expressly negate a preexisting condition of pain. He said he had no *difficulty* with the stump or the prosthesis for 14 or 15 years before the second injury. When asked if during that period he had ''episodes of irritation or drainage'' he replied that there was never any drainage and that while sometimes on walking there was a ''redness'' or ''roughness'' there was never any *disorder*. He later testified that he had never been hospitalized for the stump. But he was not asked whether he felt pain in the stump *before* the industrial injury. Under examination by his own counsel, he *was* asked in what parts of his body he felt pain or discomfort *following* the industrial accident. In reply he referred to several parts of his body including his left leg from the ''socket'' all the way down to the stump. Shortly thereafter, in further reference to this description of pain, he explained in detail the condition of the stump *after* the industrial injury. It is clear to us that these inquiries were directed to his condition following the accident.

Therefore we think that the commission could reasonably infer that pain was a concomitant of the preexisting cyst

condition, that such pain did in fact preexist the second injury but that it was not severe enough either to hospitalize applicant or keep him from his employment. Questions as to the weight of the evidence are not within our province.

██ There being some evidence which by reasonable inference will support the finding of the commission in respect to the foregoing factors of disability, we are without power to disturb it. (*Mercer-Fraser Co.* v. *Industrial Acc. Com.* (1953) 40 Cal.2d 102, 114 [251 P.2d 955] ; *Industrial Indemnity Co.* v. *Industrial Acc. Com.* (1953) 115 Cal.App.2d 684, 692 [252 P.2d 649].) We conclude that the 5 per cent rating for the factors of disability discussed above is supported by the evidence.

██ We turn to the third contention on appeal. The point of the Fund's argument is this: The applicant had two preexisting disabilities for which he received subsequent injuries benefits: (1) below the knee amputation of the left leg in 1944, 15 years before the industrial injury; and (2) total loss of hearing in the left ear which was congenital and therefore existed for 39 years, the applicant being of that age at the time of the industrial injury. Nevertheless, argues the Fund, both of the above disabilities were rated by the commission as if they were the result of the industrial injury of August 31, 1959. Such ratings were therefore erroneously made because they were not adjusted for prior rehabilitation from the above two disabilities.

The applicant testified that he was first employed by the Division of Contracts and Rights of Way in 1948, 11 years before his industrial injury; that after the first year or so he was assigned to the trial of condemnation cases, eventually becoming the principal trial attorney; and that his prosthesis never hindered him in his work. While there is no testimony one way or the other as to whether his loss of hearing affected his trial work, his continuous activity as the chief trial attorney without any complaint as to the quality of his work would give rise to the inference that it did not.

As we have already pointed out, the rating specialist rated both the preexisting leg disability and the preexisting ear disability as if they had occurred on August 31, 1959, as a result of the industrial injury. The record is clear that the commission adopted such ratings without any adjustment.

The same problem which derives from these circumstances was presented to and decided by the court in *State of Cali-*

*fornia* v. *Industrial Acc. Com.* [*Springer*] (1954) 129 Cal.
App.2d 302 [276 P.2d 820]. There the employee was 37 years
old and a deaf-mute since birth. After completing two years
of high school he became fairly steadily employed. At the
time of his industrial injury he had been continously em-
ployed at the same job for eight years and after the injury
returned to the same job at the same wage. There, as in the
instant case, the commission gave the employee the same rat-
ing for his preexisting disabilities as if they had been caused
by the industrial injury. Referring to Labor Code section
4660,[7] the court observed that the permanent disability rat-
ing schedule adopted by the commission pursuant thereto was
only prima facie evidence of the percentage of permanent
disability and that the rehabilitation theory as a principle
underlying the schedule ''is basic in determining the extent of
partial permanent disability in compensation cases. (1 Camp-
bell, Workmen's Compensation, p. 728; *Pacific Gas & Elec.
Co.* v. *Industrial Acc. Com.,* 126 Cal.App.2d 554, 557-558
[272 P.2d 818].)'' (P. 304.)

Holding that the prima facie evidence of the schedule had
been rebutted by the other uncontradicted evidence before
the commission, the court in *Springer* annulled the award
with directions, Justice Dooling writing: ''The patent error
of the commission was to rate a congenital condition of deaf-
mutism to which the applicant had so far adjusted himself as
to be reasonably employable, after the injury as well as
before, by the same standard that it would have been rated if
the applicant had lost his hearing and speech in the same
accident in which he received the injury to his hand. It is
obvious that his disability would have been much greater if
he had had the normal faculties of speech and hearing up to
the time of his accident and had lost them then, with the
whole period of adjustment to their loss before him, than it

---

[7]Labor Code section 4660 in relevant part provides: '' (a) In deter-
mining the percentages of permanent disability, account shall be taken
of the nature of the physical injury or disfigurement, the occupation of
the injured employee, and his age at the time of such injury, *considera-
tion being given to the diminished ability of such injured employee to
compete in an open labor market.*

''(b) The commission may prepare, adopt, and from time to time
amend, a schedule for the determination of the percentage of permanent
disabilities in accordance with this section. Such schedule ... without
formal introduction in evidence shall be prima facie evidence of the
percentage of permanent disability to be attributed to each injury
covered by the schedule.'' (Italics added.)

could possibly be with the whole period of adjustment to their lack behind him.'' (P. 304.)

Four years later the same problem which confronted the court in *Springer* and now confronts us was presented to the Supreme Court in *Gonzales* v. *Industrial Acc. Com.* (1958) 50 Cal.2d 360 [325 P.2d 993]. There the employee was 42 years old, a deaf-mute since the age of 5 and unable to read lips. He worked as a painter for a number of years before his industrial injury. Upon the granting of a petition for reconsideration filed by the Fund, the commission rerated the employee's disability for deaf-mutism on the basis of *50 per cent* of the standard rating for loss of speech and loss of hearing industrially caused, thereby relieving the Fund from liability. The Supreme Court rejected the employee's contention that such adjustment of the standard rating was not sustained by the evidence and was unreasonable and arbitrary, Justice McComb writing: ''(2) It is error to rate a congenital condition of deaf-mutism to which petitioner has so far adjusted himself as to be reasonably employable after the injury as well as before by the same standard that it would have been rated if petitioner had lost his hearing and speech in the same accident in which he received the industrial injury. (*State* v. *Industrial Acc. Com.,* 129 Cal.App.2d 302, 304 [1] [276 P.2d 820] [hearing denied by the Supreme Court].) Petitioner's disability would have been much greater if he had had the normal faculties of speech and hearing up to the time of the accident and had lost them then, with the whole period of adjustment to their loss before him, than it could possibly have been with the whole period of adjustment to their lack behind him. . . . The court in such case [i.e., *Springer*] indicated the correct procedure as that set forth under rule (2), *supra.* In the present case, the commission, in following this rule, concluded that deaf-mutism did not seriously affect petitioner's ability to be a painter and that he had adjusted well to his condition. There is thus sufficient evidence in the record to support its finding.'' (Pp. 365-366.)

The above decisions control the instant case. Indeed the commission does not challenge them, makes no mention of *Springer,* and cites *Gonzales* only in reference to the substantial evidence rule. The commission's argument that awards of permanent disability are sustainable even where there is no impairment of earning capacity is beside the point and

does not squarely meet the issue before us. We hold that the commission should have made such further adjustments of the standard ratings for the preexisting disabilities as in the light of the evidence before it were in its sound discretion necessary and proper to give effect to any rehabilitation determined by it to have occurred in respect to these disabilities prior and up to the date of the industrial injury.

Finally we consider the Fund's contention that the rating for the *industrial* injury was the result of an unwarranted pyramiding of compensation. The point of the argument is this: that the rerating of the disability to the back, head and neck upon a more detailed request describing the head disability in a separate paragraph (see footnote 3, *ante*) actually added nothing to applicant's overall disability and resulted in the pyramiding of compensation under which the applicant received an additional rating of 15 per cent for something which did not alter or extend his basic permanent disability.

As already pointed out, Panel One of the commission, having granted the applicant's petition for a reconsideration, submitted to the rating bureau certain factors of disability. These, we have seen, were described in more detailed form than in the referee's first request. They were set forth in two paragraphs—the first pertaining to the head disability[8] and the second to the neck, spine and back disability.[9] The record shows that the schedule for rating permanent disabilities was then applied as follows: In rating the head disability, the rating specialist used classification 1.7 "headaches" (found under the general division "Brain and Nervous System") which sets forth the following standard ratings—slight, 5 per cent; moderate, 15 per cent; severe, 60 per cent; pronounced, 100 per cent. He then gave the head disability a 10 per cent standard rating. It is easily seen, as the commission asserts and the Fund does not deny, that this

---

[8]The first paragraph reads: "Frontal headaches three or four times a week lasting several hours, two to four aspirines [*sic*] bringing relief after several hours, becoming severe after tension at work, and interfering with work."

[9]The second paragraph, after describing certain limitations of motion, reads: "... sensation of stiffness on both sides of spine in neck region, becoming stiff and tight during cold weather, and painful on sudden motions of neck; now requires assistance to complete work he could formerly complete alone; applicant limited to light to slightly moderate work."

rating was midway between slight (5 per cent) and moderate (15 per cent). In rating the neck and spine disability, the rating specialist used classification 18.1 "impaired function of the neck, spine, or pelvis" (found under the general division "Neck, Spine, or Pelvis") which sets forth the following standard ratings—slight, 30 per cent; moderate, 50 per cent; severe, 100 per cent. He then gave the back disability a standard rating of 40 per cent, clearly midway between slight (30 per cent) and moderate (50 per cent). As stated earlier, these two standard ratings after adjustment for age and occupation totaled 47 per cent and were thereafter further adjusted to 43¾ per cent by application of a multiple disability rating table.

The Fund's attack on these ratings is based largely on the subsequent testimony of the rating specialist. So far as is here pertinent, he stated that there was nothing in the description employed in the first paragraph (head disability) that would prevent the applicant from doing light to slightly moderate work; that so far as he could tell from the first paragraph description, the applicant's head disability did not extend his "overall disability" beyond being limited to light to slightly moderate work; that the description in the first paragraph actually did not "add anything to the ultimate description of the disability, '[a]pplicant limited to light to slightly moderate work' "; and that if all the factors had been put in one paragraph he "would think" that the rating would be 40 per cent standard.[10]

He further testified that his key to his rating the back disability pursuant to the description in the second paragraph was the concluding phrase "[a]pplicant limited to light to slightly moderate work"; that the rest of the second paragraph, namely the detailed description relating to the neck, spine and back, added nothing and was considered sur-

---

[10]Rating specialist E. T. Daugherty testified: "Q. If, instead of being separated into two paragraphs, these factors relating to the head, and to back, neck and spine were in one paragraph, the recommended rating would be 40 per cent standard, would it not? A. I would think so, yes. . . . THE REFEREE: You mean then instead of arriving at a 40 per cent standard plus ten per cent, you mean it would be limited to 40 per cent standard? A. Correct."

NOTE: It will be recalled that the first request for a rating submitted the following description: "Disability in back, head, neck, limiting applicant to light to moderate work." The rating therefor was 40 per cent standard.

plusage; and that by considering the above phrase, he chose the highest description of disability.

It is clear then that the rating expert, in response to the factors submitted by the panel, rated two separate disabilities, that is the head disability and the back disability, and thereupon applied multiple tables to avoid pyramiding the ratings arrived at. We sense that the Fund's objection to this rating procedure derives to a great extent from the fact that the first request for a rating was less detailed, in one sentence, and productive of a standard rating of only 40 per cent for disability in back, head and neck. That in our opinion is immaterial. It was properly within the province of the commission to select and set forth the factors of disability which were to be the basis of the rating. Indeed, if it were necessary to find a justification for the second request, it could well be argued that the first request was so lacking in specificity and completeness as to be violative of the commission's rules. (See Rules of Practice and Procedure of the Industrial Accident Commission, rule 10927.) The determination of the percentage of disability attributable to the industrial injury is a matter left to the sound discretion of the commission. (*Ford Motor Co.* v. *Industrial Acc. Com.* (1927) 202 Cal. 459, 464 [262 P. 466]; *Hines* v. *Industrial Acc. Com.* (1932) 215 Cal. 177, 188 [8 P.2d 1021]; *Tanenbaum* v. *Industrial Acc. Com.* (1935) 4 Cal.2d 615, 618 [52 P.2d 215]; *W. P. Fuller & Co.* v. *Industrial Acc. Com.* (1962) 211 Cal.App.2d 9, 17-20 [27 Cal.Rptr. 401].)

The Fund argues that the rerating of the disabilities contravenes certain principles announced in *State Compensation Ins. Fund* v. *Industrial Acc. Com.* [*Hutchinson*] (1963) 59 Cal.2d 45 [27 Cal.Rptr. 702, 377 P.2d 902]. That case dealt with two *separate* and *successive* industrial injuries. In July 1958, the employee sustained an injury to his neck. Based on a finding of minimal pain in the back of the neck extending to the shoulders and becoming "slight" and "moderate" with certain activities, the commission gave the applicant's disability a permanent disability rating of 26 per cent. In November 1958, the employee sustained an injury to his back. The factors of disability were described as "Minimal low back pain increased to slight on heavy work." The second disability was also rated at 26 per cent. It was clear that while not identical, the two disabilities *overlapped*. The rating expert testified that if the factors for both awards were com-

bined, the combined disability would warrant a rating of something more than 26 per cent but less than 52 per cent. The carrier for the employer contended that in the light of the above testimony, the second award represented an unwarranted pyramiding of compensation. The commission contended that if separate parts of the body were injured in separate industrial accidents, each injury should be rated separately and the combined disability was immaterial.

*Hutchinson* involved an application of Labor Code section 4750[11] and posed the problem of determining compensation for a later injury to an employee already suffering from a previous permanent disability. As the court pointed out, the above statute was interpreted in the *Smith* case to mean that the second employer "is not liable for compensation for the ensuing combined disabilities, but only for that portion of permanent disability which is caused by the last injury." (*Smith* v. *Industrial Acc. Com* (1955) 44 Cal.2d 364, 365 [282 P.2d 64].) The problem in *Hutchinson* was in computing the percentage of disability attributable to the second injury, since the two disabilities *overlapped* and the combined disability rating for both was less than the sum of each taken separately.

The court annulled the award holding that "[T]o the extent that the factors of disability due to both injuries overlapped, that is, to the extent that the second injury did not further reduce his earning capacity nor his ability to compete in the open labor market, he should not be compensated twice" (59 Cal.2d at pp. 53-54) and that the percentage of disability should be calculated by subtracting the prior percentage of disability from the percentage for the combined disability after the second injury, following the method employed in *Gardner* v. *Industrial Acc. Com.* (1938) 28 Cal.App.2d 682 [83 P.2d 295]. Justice Peters concluded that "the disability resulting from a subsequent injury should be

---

[11]Labor Code section 4750 provides: "An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability or impairment.

"The employer shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed."

compensable only to the extent that it can be said that the employee's earning capacity or ability to compete has been decreased from what it was immediately prior to the second injury. The computation of this figure cannot be determined by a mechanical application of a method of apportionment based upon whether the injury occurs to the same anatomical part of the body. It must come from a consideration of the nature of the disability caused by the injury.'' (P. 53.)

The Fund argues that the above rules which under *Hutchinson* apply to disabilities resulting from successive industrial injuries must necessarily apply to disabilities resulting, as they do here, from the same industrial injury.[12] We disagree. *Hutchinson* involves Labor Code section 4750 and the problem of calculating the percentage of disability attributable to the second of *two* separate industrial injuries with *overlapping* factors of disability. We find nothing in *Hutchinson* which states or intimates that the rule prescribed by section 4750 for *successive* injuries or the procedures approved in *Hutchinson* for rating such injuries, are applicable in the rating of disabilities for a *single* industrial injury. In support of its argument, the Fund hypothesizes a situation where the present applicant instead of sustaining head and back disabilities in *one* injury, sustained an injury to his back in one injury and a subsequent injury to his head in a later injury. All that is beside the point. This is not a case where a later disability adds to but at the same time overlaps a prior disability. Furthermore in attempting to infuse into the instant case the rationale of *Hutchinson*, the Fund appears to assume that the instant head and back disabilities overlap. The record shows that they were considered as separate disabilities. Even in a situation of successive injuries, *Hutchinson* recognized that '' [i]f successive injuries produce separate and independent disabilities then each is properly rated separately without concern for the theoretical 100 per cent assigned to 'total' disability.'' (*State Compensation Ins. Fund* v. *Industrial Acc. Com.* [*Hutchinson*], *supra*, 59 Cal.2d 45, 53; see *Smith* v. *Industrial Acc. Com.*, *supra*, 44 Cal.2d 364; *Pacific Gas & Elec. Co.* v. *Industrial Acc. Com.* (1954) 126 Cal.App.2d 554 [272 P.2d 818].)

We conclude that there is no unwarranted pyra-

---

[12]We point out that although the instant case involves a preexisting disability and subsequent injuries benefits under Labor Code section 4751, the rating procedure here in issue pertains only to the later industrial injury and the disabilities resulting therefrom.

miding of compensation as claimed by the Fund and that any effect of pyramiding which might have resulted from the addition of the individually rated head and back disabilities was avoided by the commission through its application of the multiple tables.

The opinion and order (granting reconsideration) and amended decision (after reconsideration) given and made under date of July 16, 1963, is annulled insofar as the petitioner Subsequent Injuries Fund of the State of California is concerned and, as to such petitioner, the case is remanded to the Industrial Accident Commission with directions to take such further proceedings as may be necessary in accordance with this opinion.

Bray, P. J., and Molinari, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied May 27, 1964.