OTOE FOOD PRODUCTS COMPANY, APPELLANT, V. GEORGE CRUICKSHANK, APPELLEE.

3 N. W. (2d) 452

FILED APRIL 17, 1942.   No. 31344.

*Lloyd E. Peterson*, for appellant.

*Thomas E. Dunbar, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

This is a compensation case.  The employer alleged in its petition in the workmen's compensation court and in the

district court that the employee suffered an injury to his right eye, for which he was paid compensation for temporary total disability and medical expenses; that the employee is claiming compensation benefits for the permanent total loss of vision in his right eye by reason of the injury. The employer then pleaded a second injury to the employee's right eye, the details of which are shown in a statement of the evidence. The employee's answer in the district court alleged that in the course of his employment he sustained an injury to his right eye, causing permanent total loss of vision. The compensation court granted an award of $15 a week for 125 weeks from and after February 27, 1939. This award was affirmed by the district court and from its judgment the employer appeals.

The record discloses that the employee had been employed by Otoe Food Products Company since 1930. At the time of the accident in question he was head fireman in charge of boilers, and on October 14, 1937, while in the course of his employment, a gland on a pump had broken and he was repairing it. He attempted to remove it with a center punch, and a piece of steel lodged in his right eye. The next morning he notified the employer of the accident and was requested to go to a physician for treatment, which he did. He later went to a specialist who treated him for some period of time. He developed a traumatic cataract on his eye, which began to show up October 19, 1937, and on or about January 23, 1939, he underwent an operation for removal of the cataract. According to the expert's testimony this operation consisted of making "an incision in the front part of the eye with a small splinter knife for the purpose of opening up that eyeball wide enough to permit the cataract to be withdrawn. The incision is made in the edge of the cornea in an eye; looking straight at an eye that incision would follow the upper part of the curve of the colored part of the eye where it joins the white of the eye and it would occupy about a little less than one-half of the circumference of the cornea." After the operation the incision was sutured, and the employee remained in the hospital until the fifth

day. On January 28, 1939, a test of the percentage of vision in the right eye was taken. It showed 90 per cent. vision with glass correction. His eye was bandaged; he then went to his home to convalesce and shortly thereafter, while he was sitting in a chair, his wife was playing with a small son, who lassoed her with a rope around her ankles, causing her to fall; she extended her arm, striking the employee in his bandaged eye with her hand. He suffered pain, his eye became inflamed; he went immediately to the doctor, who advised removal of the eye, but this was not done.

The medical testimony of the attending physician showed that the employee's eye had a puncture wound through the front part of the eye a little above and toward the temple from the center of the pupil, and that the puncture would have penetrated far enough to injure the crystalline lens, which lies one-eighth of an inch back in the eye, back of the cornea; that the cataract was caused by the trauma. After the operation, as heretofore described, the doctor testified, the employee's vision was limited to the perception of light, and he was not able to count his fingers. His vision was one-tenth of 1 per cent. after the original accident on October 14, 1937, and from such time until the removal of the cataract it was less than one-tenth of 1 per cent. and continued that way until January 23, 1939, the date of the operation; therefore, the vision in the one eye was 90 per cent. corrected with glass. The attending physician in October, 1939, examined the employee, who could count his fingers and had about 80 per cent. vision with correction with plus 13 lens, which is like a magnifying glass 3/16 of an inch thick.

In August, 1940, at the time of the trial, the real condition as to vision was about the same, a trifle less than 80 per cent. with correction, and without correction was practically zero. Another expert examined the employee's right eye and found it was aphacic, with some scarring in the limbus of the eye cornea; that there existed a surgical coloboma of the right iris; that there were some thick capsular remains in the right pupillary space; that there had been surgical removal of the crystalline lens, and when such lens

is removed there is "an imperfect field of vision, and a very small amount of vision with the applying of lens to the eye," approximately 3/400, as recorded on Snellen charts, so that, after removal of the cataract, there would have to be applied some mechanical means of refraction. The doctor testified that the second accident to his eye had not changed employee's condition with reference to vision; that the employee had peripheral vision, but not to the extent he would have had, had he not been injured; that without the aid of glasses he had no industrial vision. He also testified that the employee sees centrally with the injured eye alone, and, with the use of lens and considering the two eyes together, he still has industrial loss of vision in the right eye, since it is impossible to use the two eyes together when a heavy lens is required before the injured eye; that with the assistance of glass the employee still would not have coordination. The operating surgeon also testified to lack of coordination under the circumstances.

The employer called a specialist who referred to an especially constructed lens now being perfected for industrial purposes, like a telescopic lens, only in the reverse, to reduce the retinal image so that it fits the one on the opposite side. He testified that with a size lens, as described by this expert, the vision of employee's right eye could be corrected to 97 per cent. normal, and, in his opinion, with the aid of glasses there would be full coordination of both eyes. All of the experts agreed that without the aid of glasses the vision in the right eye for industrial purposes is gone. We deem the foregoing a sufficient statement of the medical testimony.

The employer's contention is that the employee suffered a second accident which constituted the proximate cause of the loss of vision, if any, of his right eye, and that such accident was not suffered in the course of his employment. This is an affirmative allegation, the burden of proof being on the employer to prove the same with reasonable certainty. The medical experts were unable to determine the degree of disability, if any, caused by the second accident, as distinguished from the first accident, or just how much, if any, the sec-

ond accident contributed to the loss of vision of the employee's right eye. It was not wilfully or negligently brought about through any conduct of the employee, and he in no manner contributed to it. We conclude, under the circumstances, that the employer's contention that the second accident constituted the proximate cause of the loss of vision of the employee's right eye is without merit.

The next question presented by the employer,—and one of first impression in this state,—is whether or not the compensation law of Nebraska contemplates that the court may take into consideration, in determining the loss of vision of an eye or eyes, the fact that vision may be restored or corrected, in part or in whole, by the use of glasses. In this connection, it is pointed out that, with the exception of the payments made for temporary total disability in the instant case, and some book work which he performed for a short period of time, the employee worked at his usual vocation at the same wages he received prior to the time of the accident, and the employer cites the case of *Washington Terminal Co. v. Hoage,* 79 Fed. (2d) 158, wherein the court said:

"The intention of the law is to provide compensation for loss or disability in earning power and not indemnity or damages for injury to a member of the body. It is consistent with the purpose of that act that the disability of an employee resulting from an injury to his eyes should be considered with reference to the benefit resulting from the use of glasses.

"It is true that the authorities are not uniform upon this question, partly owing to differences in the controlling statutes. But we think that the greater weight of authority is with the view above expressed."

Without setting forth the authorities from the different states which have passed upon this question, a review of the decisions of several states discloses that California, Connecticut, Florida, Indiana, Maine, Nevada, New York, Ohio, Rhode Island, Tennessee, Texas and Massachusetts rate eye losses with correction, and many of these states have com-

pensation laws that specifically require or permit the rating of eye losses with correction. The states of Colorado, Delaware, Georgia, Idaho, Illinois, Kansas, Maryland, Minnesota, Missouri, North Carolina, Oklahoma, Utah, Virginia, Washington and West Virginia rate eye losses without correction. North Dakota, Oregon, Vermont, Wisconsin, and the United States show rating arrived at with or without correction. New York particularly, Pennsylvania and Michigan take the view that glasses may be taken into consideration. Cases, however, are determined upon the statutory enactment of the particular state. Many of these statutes provide for payment only when there is loss of earning power.

The most formidable decisions cited by the employer in support of its contention follow:

In *Cline v. Studebaker Corporation*, 189 Mich. 514, 155 N. W. 519, the court held: "However, for the partial loss of the sight of claimant's eye, which could be minimized by the use of glasses, so that no diminution of earnings took place, and no impairment of his earning capacity appeared from the testimony, the board was not authorized to award compensation * * * though without glasses he had only ten per cent. of normal vision but fifty per cent. with them."

In *Bochecchio v. Charnin Contracting Co.*, 209 App. Div. 619, 205 N. Y. Supp. 350, the court held: "Where the loss of vision may be corrected by the use of glasses no award for the defect should be made." And in *Frings v. Pierce Arrow Motor Car Co.*, 169 N. Y. Supp. 309 (182 App. Div. 445), it was held: "Where an employee lost the lens of an eye, but could see by use of an artificial lens, if he did not use the good eye at the same time, and could continue his work without loss in wages, there was no 'loss of an eye,' nor 'loss of use of an eye,' within workmen's compensation law."

In the case of *Foster v. Schmahl*, 197 Minn. 602, 268 N. W. 631, the court held that, in "determining the extent of injuries occasioned to the vision as the result of an industrial accident, 'correction by glasses' may be taken into consideration."

*Contra,* the most pertinent decisions in support of the employee's contention are as follows:

The Minnesota court in the case of *Butch v. Shaver,* 150 Minn. 94, 184 N. W. 572, held: "Where an employee sustains a personal injury by accident arising out of and in the course of her employment which irrecoverably destroys the sight of her right eye, though with extra artificial means she may have fair vision, she is entitled to compensation as for the loss of the eye, under the provisions of" the Minnesota compensation act. And in *Livingston v. St. Paul Hydraulic Hoist Co.,* 279 N. W. 829 (203 Minn. 62), the court said, referring to the act: "For permanent partial disability to an eye, the extent of partial loss of vision as determined by the Snellen formula should be determined without regard to possible correction by use of glasses or corrective lens." While an apparent conflict seems to exist in the Minnesota court's determination of the question, it is quite evident that the circumstances, as disclosed by each case, governed the court's decision.

A case similar to the one at bar is *Juergens Bros. Co. v. Industrial Commission,* 290 Ill. 420, 125 N. E. 337, which we set forth in some detail. In that case the employee was struck in the eye with a small piece of steel while he was engaged in the course of his employment, in setting knives on a beveling machine. The injury caused him but little pain, but several weeks thereafter he noticed the eye was failing, and he secured glasses which gave him some relief. Subsequently, a cataract was removed. The operating surgeon was required to penetrate the cornea and iris and remove the lens of the eye and the piece of steel. The medical testimony showed that it would be impossible to bring the vision of the injured eye to harmonize with the other eye, the vision of which was normal. (This seems to be the weight of the medical testimony in the instant case.) The evidence disclosed that lenses could be secured to enable the employee to see at the fixed focal distance of such lenses. The employee, therefore, had lost the power of accommodation. The estimated loss was three-fourths of a normal eye with such

lenses. The employee since recovery from his temporary disability had been able to and had earned wages equal to his earnings paid prior to the accident. The court held: "Where an employee by an injury to one eye loses all practical use of it except by the use of lenses giving him normal vision at fixed distances, the injury amounts, in effect, to loss of sight of the eye, notwithstanding the possibility that he might to a certain extent recover the sight of that eye if the sight of the other eye should be destroyed."

In the instant case the crystalline lens was removed, and the weight of the testimony of the eye-specialists is that, even with the use of artificial means and scientific processes, the employee would not have normal or proper coordination of his eyes. This we deem necessary to constitute proper restoration or correction where there is a loss of vision.

In an analysis of section 48-121, Comp. St. 1929, we see nothing in the act indicating an intention on the part of the legislature that disability after correction should be the basis for awarding compensation, where there has been an eye injury. If such had been the legislative intent, the act would no doubt have been drafted to so provide. We should not, by construction, put into a law provisions which it does not contain, nor read into it a meaning not intended by the legislature. If the act is faulty, the correction should be made by the legislature and not by the court. We see no more logic in holding that the legislature intended to base disability in an eye case on the condition of the eye after correction than in a leg or arm case where compensation should be awarded on the extent of disability after the attachment of a brace or other appliance. The fact that glasses are required to restore vision is evidence of the permanency of the injury, and whether artificial means may partially or even wholly restore sight, it nevertheless cannot obliterate the effect of the accident causing the injury.

Referring to the statement made in the opinion and the claim of the employer that the employee continued his work from and after the injury at the same wages, this would not bar his right to recovery under the compensation act for the

loss of vision of his right eye. Section 48-121, Comp. St. 1929, definitely fixes compensation for the loss of an eye without exception.

There is no contention made that, in the event the employee is entitled to compensation for the loss of his right eye, the award of $15 a week for 125 weeks would not apply. Other assignments of error are without merit.

For the reasons given in this opinion, we conclude that the award as granted by the district court should be and is hereby

AFFIRMED.