[Civ. No. 35840. Second Dist., Div. Five. July 21, 1970.]

STATE COMPENSATION INSURANCE FUND, Petitioner, v. WORKMEN'S COMPENSATION APPEALS BOARD and GEORGE L. HILL, Respondents.

---

---

COUNSEL

T. Groezinger, Loton Wells, P. M. Miyamoto and A. C. Jones for Petitioner.

Rupert A. Pedrin, Nathan Mudge, Gabriel Sipos, Sheldon M. Ziff and Warren C. Deutsch for Respondents.

---

OPINION

**SELBER, J.**[*] — George L. Hill, a 55-year-old electrician, ruptured his left eye on the end of a pipe bender which he was using in the course of his employment on November 21, 1967. Enucleation of the eye was necessary and an artificial eye was implanted. The Workmen's Compensation Appeals Board issued an award against petitioner, the employer's compensation insurer, which included compensation for permanent disability rated at 41½ percent, which is the standard scheduled rating for "enucleation of an eye with ability to wear prosthesis" (30 percent) modified for Hill's age and occupation.

Hill had a history of eye trouble beginning in 1960 for which he had been treated by Dr. John Richards. The records of Dr. Richards, introduced in evidence and uncontradicted, reflect that he treated Hill for glaucoma of both eyes, performed surgery for glaucoma on both eyes on November 7, 1960 (described as irido-corneal sclerectomies), and performed further surgery on the left eye for removal of a cataract on October 12, 1966 (described as "a full iridectomy to complete the peripheral iridectomy that had been previously done . . ."). The record of the cataract surgery describes certain steps taken "to continue the extraction of the lens." After the cataract surgery the doctor prescribed "lenticular cataract lenses," and on September 9, 1967, in reporting a reorder of lenses for lenses which had been scratched, he described Hill's eye condition as "Aphakia post surgical left eye. Chronic glaucoma both eyes."

In a report dated December 19, 1967, Dr. Richards expressed the opinion that the surgery for glaucoma had been accomplished "with good results and a stabilization of the condition" and that after surgery for removal of

---

[*]Assigned by the Chairman of the Judicial Council.

the cataract Hill had "an excellent return of vision to the level of 20/25 with glasses." Dr. Stansbury, an independent medical examiner appointed by the appeals board while the matter was under reconsideration, examined Hill on July 30, 1969 and reviewed Dr. Richards' records. He reported, under date of August 7, 1969, that he found "no contradiction to the fact that this patient had bilateral glaucoma surgery in 1960 and that in 1966 a left cataract was extracted, with what apparently was a good result." Relying on these statements of the two doctors, the appeals board concluded that there was no preexisting permanent disability of the eye and refused to apportion any part of the overall rating for loss of the eye to preexisting disability.

Petitioner seeks annulment of the award of permanent disability, contending: (1) the records of Dr. Richards compel a finding that the natural lens of the enucleated eye had been extracted in the cataract surgery, leaving the left eye with the condition of abnormal vision known as "aphakia"; (2) the scheduled rating for aphakia of one eye correctible to 20/25 is 20 percent standard, which modified for Hill's age and occupation would be 29½ percent; the scheduled rating is, pursuant to Labor Code section 4660,[1] prima facie evidence which is unrebutted of the propriety of the percentage rating for the disability described; and, (3) therefore, pursuant to the provisions of Labor Code section 4750[2] as applied in cases of "overlapping" disabilities (See *State Comp. Ins. Fund* v. *Industrial Acc. Com.* [*Hutchinson*] (1963) 59 Cal.2d 45 [27 Cal.Rptr. 702, 377 P.2d 902] and *Gardner* v. *Industrial Acc. Com.* (1938) 28 Cal.App.2d 682 [83 P.2d 295]), its liability for permanent disability caused by the industrial injury is limited to the difference between the rating of 41½ percent and the rating of 29½ percent, i.e., 12 percent.

---

[1]Labor Code, section 4660 provides: "(a) In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his age at the time of such injury, consideration being given to the diminished ability of such injured employee to compete in an open labor market.

"(b) The administrative director may prepare, adopt, and from time to time amend, a schedule for the determination of the percentage of permanent disabilities in accordance with this section. Such schedule shall be available for public inspection, and without formal introduction in evidence shall be prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule."

[2]Labor Code, section 4750 provides: "An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability or impairment.

"The employer shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed."

The answer of counsel for the board neither admits nor denies that the eye was aphakic. It concedes that the "eye was not normal," characterizes the abnormality as "pathology," and argues that "the slight limitation in the *corrected* left eye vision was not disabling." (Italics added.) It cites the case of *Berry* v. *Workmen's Comp. App. Bd.*, 68 Cal.2d 786 [69 Cal.Rptr. 68, 441 P.2d 908], which holds that apportionment under Labor Code section 4663 is improper in the absence of evidence that permanent disability is due in part to the normal progress of preexisting disease. However, petitioner does not seek apportionment because of the preexisting glaucoma and we reject any contention that a vision deficiency should be characterized as pathology.

We think that there is no real dispute as to the facts. Dr. Richards, the only doctor who had any direct knowledge of the condition of Hill's eyes prior to the industrial accident, noted within three months of the accident that Hill had chronic glaucoma and post-surgical aphakia of the left eye. Webster's Third International Dictionary, Unabridged (1966) defines aphakia as follows: "absence of the crystalline lens of the eye; also: the anomalous state of refraction resulting therefrom." This, together with the doctor's prescription of corrective lenses, compels the conclusion that the function of the eye, measured without the use of corrective lenses, was impaired.

In charging petitioner with liability for the full rating for loss of the eye, the appeals board did not find, and there is no evidence, that naked vision in the eye was unimpaired at the time of the subsequent eye injury. The board relied upon the medical opinions that before the accident Hill had good vision with corrective lenses.[3] Obviously after the enucleation he had none, however measured.

■ Where a physically handicapped employee sustains an industrial injury which results in permanent disability which by its nature overlaps a preexisting disability, the liability of the employer or insurer under the rule of *Gardner* and *Hutchinson* cited by petitioner, is to be determined by deducting the preexisting disability from the combined disability. ■ Although Labor Code section 4660, subdivision (b) makes the scheduled rating of a particular factor of disability prima facie evidence of the percentage of permanent disability to be attributed to each "injury" covered by the schedule, the scheduled ratings assume that all components of a member or organ are simultaneously lost and incorporate the schedule framers' opinion that the simultaneous loss rendered the several component

---

[3]The medical opinions do not state that with corrective lenses peripheral or near vision was abnormal. In the absence of medical evidence of a ratable defect in corrected vision, the board properly concluded that applicant's corrected vision was within the normal range.

disabilities either greater or lesser than each would have rated if it had been incurred separately. In other words, the rating for loss of a leg may be more or less than the total of the individual ratings of various disabilities in the form of limited motion, loss of minor members, etc. ■ It is apparent that the schedule cannot be conclusive as to the measure, in percentages of disability, to be attributed to preexisting component factors of disability. Furthermore, the appeals board must make such adjustments to the standard ratings for preexisting disabilities "as in the light of the evidence before it were in its sound discretion necessary and proper to give effect to any rehabilitation . . . up to the date of the industrial injury." (*Subsequent Injuries Fund* v. *Industrial Acc. Com.* [*Rogers*] (1964) 226 Cal.App.2d 136, 147-150 [37 Cal.Rptr. 844]; *Gonzales* v. *Industrial Acc. Com.* (1958) 50 Cal.2d 360, 364-366 [325 P.2d 993]; *State of California* v. *Industrial Acc. Com.* [*Springer*] (1954) 129 Cal.App.2d 302, 304 [276 P.2d 820].)

So far as we have been able to determine, the propriety of measuring eye disability by corrected vision has never been squarely presented for determination by the courts of this jurisdiction. Neither the parties nor the appeals board has cited any authorities, indicated the practices of the board, or advanced any arguments in respect to this question although this is the obvious point of their disagreement.

The only case which we have found which touches on the subject is *Globe etc. Mills* v. *Industrial Acc. Com.* (1923) 64 Cal.App. 307 [221 P. 658]. In that case a workman *who had no previous vision deficiency* lost the natural lens of an eye as a result of an industrial injury. After the injury, vision in the naked eye rated at 1/100, but with the use of glasses it was practically normal for most purposes. The employer contended that an award of permanent disability based on the scheduled rating of 19¼ percent for loss of the lens was excessive in view of the fact that complete loss of sight in the eye would rate only 35½ percent under the schedule and the disability amounted to little more than the mere inconvenience of wearing glasses. The court upheld the award, reasoning that the loss of use of any organ or member constituted a permanent disability and the use of glasses, like the use of crutches or a wheelchair, could never be "a complete or satisfactory substitute for Nature's art." (P. 312.) In support of this conclusion it considered the possibility of removal of the glasses by accident, the possibility that the workman might not always be able to keep them in his possession, and the inadequacy of glasses to perform in full the function of the natural lens of an eye. In respect to the propriety of the percentage assigned by the schedule for loss of the lens of an eye, it commented that perhaps "the most that can be truthfully said of such determinations is that they are approximate and that they actually amount to nothing more than a rough estimate." (P. 313.) It concluded that, so far as it was able to

determine, there was no abuse of discretion. This case seems to be the source of the "correction" factor contained in the scheduled rating.

In *Edson* v. *Industrial Acc. Com.* (1928) 206 Cal. 134 [273 P. 572], cited by petitioner, the employee had lost 30/50ths of the sight of each eye, and in a subsequent industrial injury he lost an additional 17½/50ths of the sight of his left eye. It was held that only the latter impairment should be included in the award. The case makes no mention of the use of corrective lenses either before or after the subsequent injury. Nor does it state how the vision loss was determined. The case of *Wolski* v. *Industrial Acc. Com.* (1945) 70 Cal.App.2d 427 [161 P.2d 283], also cited, is the classic case of a one-eyed man who loses the other eye, the type of situation in which the combination of successive disabilities increases overall disability over what the sum of the disabilities would rate and which, from the language of section 4750, it appears, the Legislature had in mind when enacting the statute, the theory being that the employment of handicapped workmen is encouraged by assuring the employer that his liability to such an employee will not exceed the amount which would be payable to a previously sound man for the same injury. The decision of the board in the present case indicates a recognition of that ruling in its rejection of the claim of disability in the right eye, for which no error is claimed.

In 2 Hanna, California Law of Employee Injuries and Workmen's Compensation, Second Edition (1966), the author states (§ 14.01[2][c], ch. 14-7) that: "Interference with sight . . . . constitutes ratable disability, although . . . the rating allowance will be reduced to the extent that the loss is replaceable by use of glasses." He states (Vol. 1, § 17.04[2][a], ch. 17-41, 42) that: "Where possible to do so, evidence should be adduced as to the amount of correction of vision made by glasses before and after the injury, as rating is based upon this net correctible loss, when correcting glasses can be worn in the occupation in which the injury took place."

The general question of whether corrected vision is a factor to be used in determining the extent of permanent disability in cases of eye injury has been considered by the courts of numerous other jurisdictions in diverse factual situations. (See cases collected in 8 A.L.R. 1322, 24 A.L.R. 1462, 73 A.L.R. 706, 99 A.L.R. 1492, 142 A.L.R. 816.) In the leading case of *Lambert* v. *Industrial Com.* (1952) 411 Ill. 593 [104 N.E.2d 783], the Supreme Court of Illinois made a comprehensive study of case law and a realistic analysis of the underlying considerations on which the decisions turned. The opinion, written by Justice Maxwell, has been frequently quoted and has been of obvious persuasive influence on the more recent decisions of various jurisdictions which have since recognized that the loss of corrected vision is in itself a compensable permanent disability. It states

(p. 788 of 104 N.E.2d): "A study of these cases reveals that they cannot be reconciled and the courts are not in harmony on this question. Some of the differences are due to variation in the wording of the statutes. Many of the differences are due to the court's interpretation of the purpose of the statute, i.e., if the purpose of the statute is to compensate in a specific amount for a specific loss, naked vision, alone, should be considered, but if the purpose of the statute is to compensate for loss of earning power, then corrected vision should be a factor. Another cause of the conflict, not only between the different jurisdictions but even within the same jurisdiction, lies in the inclination of the courts to do justice in the case then before it with no intention of establishing a rule binding in all other cases. . . .

"The real difficulty, and one of the causes of the lack of harmony in the authorities, lies in the fact that neither rule is adequate to cover all cases. If naked vision, alone, is considered, the worker with corrected vision is not adequately protected, and if corrected vision, alone, is considered, the worker with uncorrected vision is not fully protected. In the first instance, the loss of an eye 'industrially blind' with naked vision, but normal with correction, would not be compensable; in the second, an injury rendering a normal eye industrially blind would not be compensable if it could be corrected to normal by the uses of glasses."

Typical of recent decisions, although not involving an apportionment statute, is the case of *Piper* v. *Kansas Turnpike Authority* (1968) 200 Kan. 438 [436 P.2d 396]. In that case the claimant had surgery on both eyes for the removal of cataracts which resulted in loss of the right eye and loss of lens of the left eye, leaving it aphakic. Distant vision measured 20/800 and near vision measured 14/140 with the naked eye. With the aid of glasses distant vision corrected to 20/20 and near vision to 14/14 (Jaeger-1). Due to a subsequent industrial injury claimant suffered retinal detachment which required further surgery after which vision could be corrected only to 20/70 and Jaeger-7. Relying upon an administrative rule that loss of vision should be computed without the aid of corrective lens, which was based on a prior ruling in *McCullough* v. *Southwestern Bell Tel. Co.,* 155 Kan. 629 [127 P.2d 467], the examiner found that the claimant suffered no permanent disability as a result of the industrial injury because he was industrially blind without corrective lenses prior to the accident. In the *McCullough* case, as in the *Globe etc. Mills* case, *supra* (64 Cal.App. 307), the claimant had normal vision without correction prior to the industrial accident. The court in *Piper* held that where an employee has corrected vision at the time of industrial injury the rule of *McCullough* could not fairly be applied that the difference between the corrected vision before and after the injury was the fair measure of the loss, and that, thus, the denial of

benefits was error. (See also *Stone* v. *Industrial Com.*, 58 Ohio L.Abs. 10 [93 N.E.2d 67, 70]; *Sessing* v. *Yates Drilling Co.*, 74 N.M. 551 [395 P.2d 824]; *Standard Testing & Engineering Co.* v. *Bradshaw* (Okla.) 442 P.2d 337.)

The rationale for measuring permanent disability resulting from industrial eye injury to a workman who has corrected vision by the difference between corrected vision before and after the injury is, in general, based on such considerations as the following. It is mere fiction to assume that a man with good corrected vision is blind or nearly blind. Vision corrected to the normal range of good natural vision, while never the true equal of natural vision, is adequate for most purposes. The use of corrective lenses is a common thing among people of all walks of life and in most employments. The need for correction to achieve good vision is neither a deterrent to employment nor a restriction on earnings except in very unusual occupations. The loss of the power to correct vision is a loss of function and use of the eye. It is more debilitating than an initial loss of natural vision where correction is possible as it is the irretrievable and ultimate loss of function and use of the eye.

These considerations are in our opinion realistic and reasonable. The loss of the power to correct is in itself a permanent disability which does not overlap a prior correctible loss of natural vision. Each loss requires its own period of rehabilitation.

The cases which we have cited from other jurisdictions do not deny compensation for disability in the form of *natural* vision loss even though it may be corrected subsequently by glasses; they simply apply two different rules. Under the unique apportionment statute of California, it would appear impracticable to apply the two different rules, even though fairness would seem to call for such application, if the deduction method of *Gardner* and *Hutchinson* is to be used in determining the extent of the employer's liability. If both the loss of natural vision and the loss of corrected vision were viewed as components of over-all visual loss, some formula might be devised for computing the percentage ratings and deducting them from a percentage assigned to over-all total loss of vision.

We find no obstacle to accepting as a legal conclusion the proposition that the loss of *corrected* vision is a "permanent disability," taking that term as meaning impairment of earning capacity or a competitive handicap in the open labor market. (*State Comp. Ins. Fund* v. *Industrial Acc. Com.* [*Hutchinson*], *supra*, 59 Cal.2d 45, 52.) We recognize the existence of the rule that the provisions of the workmen's compensation act are to be liberally construed in favor of extending their benefits to an injured employee.

We are also cognizant of the fact that the apportionment statutes are for the benefit of the handicapped workman, the theory being that by assuring the employer that his liability for permanent disability to a handicapped workman will not exceed that which he might incur for a workman who had no previous disability, he will be encouraged to employ the handicapped. We do not believe that this purpose will be aborted by our conclusion that the loss of corrected vision does not overlap a prior loss of natural vision. Of course if corrected vision is defective, apportionment of the percentage of prior uncorrectible vision loss would be in order.

The same result has been achieved in other fact situations on the basis of findings that rehabilitation of injured employees from the effects of prior injuries has reduced the ratings of preexisting permanent disabilities. The consideration of corrected vision in rating the subsequent disability will tend to achieve uniformity and a fair application of the law in each case which cannot be achieved by discretionary deviations from the standard schedule on the rehabilitation theory.

We conclude that the rule of the *Globe Mills* case is inapplicable to this case. Apparently the scheduled rating for loss of the natural lens of the applicant's eye after correction to 20/25, was based on the *Globe Mills* case. If the rule does not apply to an injury to a workman with corrected vision, it would follow that the rating desired by petitioner likewise would be inapplicable.

For the foregoing reasons, it is our conclusion that the decision of the appeals board is reasonable and proper and within the purpose and letter of the compensation act.

The award is affirmed.

Stephens, Acting P. J., and Reppy, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied September 24, 1970.