DONALD KALHORN, APPELLEE, V. CITY OF BELLEVUE, APPELLANT.
420 N.W.2d 713

Filed March 18, 1988.   No. 87-576.

Dennis R. Riekenberg of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Michael G. Goodman of Matthews & Cannon, P.C., for appellee.

HASTINGS, C.J., WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and BLUE, D.J.

FAHRNBRUCH, J.

This is a case of first impression to determine whether a worker whose eye was damaged in a work-related accident should be compensated on the basis of his condition before or after the natural lens was replaced by a synthetic lens.

The employer, City of Bellevue, defendant, appeals an award on rehearing by a three-judge panel of the Nebraska Workers' Compensation Court granting benefits on the basis of the worker's condition before a synthetic lens was implanted.

The compensation court found that Donald Kalhorn, plaintiff-appellee, sustained a 100-percent permanent partial disability to his left eye, entitling him to benefits of $160.60 per week for 20 $2/7$ weeks of temporary total disability, and a like sum per week for an additional 125 weeks for permanent partial disability, together with vocational rehabilitation benefits. We affirm.

The City of Bellevue claims that the Nebraska Workers' Compensation Court erred in three particulars: (1) in disregarding the permanent restoration of Kalhorn's visual acuity to 20/40 without the use of eyeglasses or contact lenses following implantation of a synthetic lens; (2) in failing to find that the City of Bellevue was entitled to reimbursement of

$5,864.30 for overpayment of permanent partial disability benefits; and (3) in finding Kalhorn was entitled to vocational rehabilitation benefits.

Our review of this case is governed by the following well-established legal principle. The findings of fact of the Workers' Compensation Court have the same force and effect as a jury verdict in a civil case and will not be set aside where they are supported by credible evidence and are not clearly wrong. See, Neb. Rev. Stat. § 48-185 (Cum. Supp. 1986); *Kingslan v. Jensen Tire Co., ante* p. 294, 417 N.W.2d 164 (1987); *Kleiva v. Paradise Landscapes, ante* p. 80, 416 N.W.2d 21 (1987).

The parties agree that on August 24, 1984, Kalhorn sustained an injury to his left eye as a result of an accident arising out of and in the course of his employment with the City of Bellevue. At the time of his injury, Kalhorn was employed as a maintenance mechanic, earning an average weekly wage of $240.90.

Prior to the accident, Kalhorn used no devices to correct his vision. Kalhorn's uncorrected visual acuity in his left eye decreased to 20/200 as a result of the accident.

When a cataract developed which was severe enough for removal, his initial treating physician recommended that Kalhorn consult a specialist. Dr. John J. Fitzpatrick, the specialist, recommended that Kalhorn undergo surgery, have the damaged eye's natural lens removed, and replace it with a synthetic intraocular lens. Without surgery, Kalhorn's cataract would have completely opacified the natural lens, resulting in Kalhorn's having only perception of light in the left eye, Dr. Fitzpatrick testified. The intraocular lens implantation was performed on September 6, 1985.

Kalhorn's corrected left eye visual acuity improved to 20/40 following the implant and two laser surgeries. The compensation court found that Kalhorn's left eye disability was reduced to 23.5 percent by the lens implant and followup treatments. The City of Bellevue claims that Kalhorn should have been awarded benefits on the 23.5-percent disability, rather than on a 100-percent uncorrected disability.

This case is similar to the Ohio case of *State, ex rel. Kroger, v.*

*Stover*, 31 Ohio St. 3d 229, 510 N.E.2d 356 (1987). There, the employee, Stover, sustained severe burns to multiple parts of his body as a result of ammonia exposure in the course of his employment. His injuries included corneal burns to both eyes. The Ohio Industrial Commission refused to consider the improvement of Stover's vision by virtue of corneal transplants. The commission reasoned that " 'surgical repair of vision is "correction". . . and not taken into account in making an award . . . .' " *Id*. at 233, 510 N.E.2d at 360. The intermediate Ohio Court of Appeals held that glasses, contact lenses, and corneal transplants are all means by which vision is corrected.

Stover's employer argued that there is a distinction between corneal transplants and optical prostheses, such as eyeglasses or contact lenses. The Ohio Supreme Court stated, "Such a distinction could be made and presents a close case of first impression for this court. To make the distinction [the employer] asks would require us to find that a corneal transplant is not merely corrective, but restores vision permanently. We decline to accept that position." *Id*. at 233-34, 510 N.E.2d at 360.

The Ohio Supreme Court acknowledged that medical technology advances might, at some future time, permit a conclusion that a corneal transplant eliminates the loss (as, for example, the resetting of broken bones could). "But, at the present and on this record, a corneal transplant is no more than a correction to lost vision." *Id*. at 234, 510 N.E.2d at 361.

The Ohio highest court held that "the improvement of vision resulting from a corneal transplant is a correction to vision and, thus, shall not, on the current state of the medical art, be taken into consideration in determining the percentage of vision actually lost . . . ." *Id*.

Nebraska's Supreme Court has not heretofore addressed the issue of how to compensate correction by an intraocular lens implant, as opposed to compensation for external correction of vision with eyeglasses and contact lenses. The first Nebraska case addressing a similar issue of compensation for loss of vision of an eye is *Otoe Food Products Co. v. Cruickshank*, 141 Neb. 298, 3 N.W.2d 452 (1942). See, also, *Gruber v.*

*Stickelman*, 149 Neb. 627, 31 N.W.2d 753 (1948); *Bolen v. Buller*, 143 Neb. 237, 9 N.W.2d 204 (1943). The specific issue in *Otoe* was whether, in determining loss of vision, restoration or correction by use of glasses should be considered under the compensation laws.

This court in *Otoe* held that permanent disability to an eye should be awarded on the basis of uncorrected vision. Across the nation, "the usual holding is that loss of use should be judged on the basis of uncorrected vision . . . and that therefore loss of use will not be ruled out because some correction is achieved" through eyeglasses or contact lenses. 2 A. Larson, The Law of Workmen's Compensation § 58.13(f) at 10-344.23 (1987).

In its *Otoe* opinion, this court stated:

> In an analysis of Section 48-121, Comp. St. 1929, we see nothing in the act indicating an intention on the part of the legislature that disability after correction should be the basis for awarding compensation, where there has been an eye injury. If such had been the legislative intent, the act would no doubt have been drafted to so provide. We should not, by construction, put into a law provisions which it does not contain, nor read into it a meaning not intended by the legislature. If the act is faulty, the correction should be made by the legislature and not by the court. We see no more logic in holding that the legislature intended to base disability in an eye case on the condition of the eye after correction than in a leg or arm case where compensation should be awarded on the extent of disability after the attachment of a brace or other appliance. The fact that glasses are required to restore vision is evidence of the permanency of the injury, and whether artificial means may partially or even wholly restore sight, it nevertheless cannot obliterate the effect of the accident causing injury.

141 Neb. at 305, 3 N.W.2d at 455-56.

The applicable portion of the workers' compensation law regarding loss of an eye has not been materially altered since the *Otoe* case. Neb. Rev. Stat. § 48-121(3) (Reissue 1984).

In this case, we follow the *Otoe* rule that disability benefits

should be awarded based on uncorrected vision. That is because the evidence demonstrates significant difficulties with Kalhorn's intraocular lens implant and because there is no evidence that such intraocular lenses will be risk-free in the future. Synthetic intraocular lenses are made of the same type of plastic material as are contact lenses. Kalhorn's synthetic lens, just like a contact lens, was specially prepared for his left eye, but is expected to be a permanent replacement lens. The evidence shows that unlike a human lens, the plastic lens is monofocused, meaning that it focuses only at one distance. A human lens has the capability of changing its focus. The human lens differs from a plastic lens because the human lens has some ability to filter out light. The implant does not have any filtering powers. Therefore, the eye may become sensitive to bright light, according to expert testimony.

Prior to the implant surgery, Kalhorn was required to sign a consent form which set forth the risks involved with the lens implant. Dr. Fitzpatrick confirmed that the consent form generally describes the nature of the implant operation, its possible benefits, and its possible side effects. Significantly, the consent form states that the long-term effect of a lens implantation is not known at the present time, nor is it known how long the eye can tolerate an intraocular lens implant. Some of the complications listed on the consent form are: infection, retinal detachment, corneal edema, edema of the macula, hemorrhage inside the eye, iris atrophy, glaucoma, and dislocation of the implant.

Dr. Fitzpatrick testified that the purpose of eyeglasses and contact lenses is to refocus light rays properly onto the retina. This is called corrected vision. In Dr. Fitzpatrick's opinion, there is no distinction between the function of a contact lens or eyeglass lens and that of Kalhorn's plastic lens implant.

Before the three-judge panel, Kalhorn testified to ongoing problems with his left eye. He stated that the vision in his left eye was still blurry; that he had difficulty seeing things up close; that heavy vibrations, such as working with a jackhammer, resulted in severe headaches; that he had difficulty looking at bright lights and with glare; that it took a longer time for his eyes to adjust to a darker environment; and that his left eye

vision was "like looking through a fog, a room full of smoke." Kalhorn said his eye problem prevented him from welding, using abrasive tools, using a needle gun, and using paint strippers because of the airborne particles produced by these pieces of equipment.

Dr. Fitzpatrick confirmed that Kalhorn's left eye is now more sensitive than a normal eye to changes in temperature; to wind, light, dust, pollen, airborne-type particles, and heavy vibrations; and possibly to fumes from chemicals.

Based upon the record, because of Kalhorn's ongoing problems and because of the risk of future problems arising from the implant surgery, the award to him by the compensation court is not clearly wrong. We recognize, as did the Ohio Supreme Court in *State, ex rel. Kroger, v. Stover*, 31 Ohio St. 3d 229, 510 N.E.2d 356 (1987), that medical technology may advance to where an intraocular lens implant eliminates the vision loss without difficulties or future risk. The record in this case does not reflect such advancement at this time. Based upon the record, at this time the implant cannot be considered as any more than a correction.

In resolving this case, we have not overlooked the case of *Lee Connell Construction Company v. Swann*, 254 Ga. 121, 327 S.E.2d 222 (1985). There, in a split decision, Georgia's Supreme Court held that an award for loss of vision should be based upon corrected vision after a lens implant. The opinion was based upon the "facts of the case," which were not recited in the opinion. Without citing authority for the proposition or defining them, the opinion was also based upon "advances in medical science." *Id.* at 121, 327 S.E.2d at 223. Because the facts of *Lee Connell* are not recited and because the "advances in medical science" are not attributed to recognized scientific authority, the *Lee Connell* opinion is not persuasive.

As a result of this court's affirming the award of 100 percent permanent partial disability benefits, the City of Bellevue's second assignment of error, regarding overpayment for benefits, has no merit.

The defendant's third assignment of error, addressing the award of vocational rehabilitation benefits, is also without merit. The compensation court panel found that "[t]here is a

reasonable probability that with appropriate training, rehabilitation or education, the plaintiff may be rehabilitated to the extent that he can significantly increase his earning capacity . . . ."

The compensation court three-judge panel's determination as to an employee's ability to return to the work in which he was previously skilled is a factual question which will not be disturbed on appeal to this court unless clearly wrong. *Nice v. IBP, Inc.*, 226 Neb. 538, 412 N.W.2d 477 (1987); *Hewson v. Stephenson*, 225 Neb. 254, 404 N.W.2d 35 (1987); *McGee v. Panhandle Technical Sys.*, 223 Neb. 56, 387 N.W.2d 709 (1986). The compensation court determined that the plaintiff was entitled to rehabilitation services, as provided in Neb. Rev. Stat. § 48-162.01 (Reissue 1984). We agree.

Kalhorn has an 11th grade education. He was employed by Peter Pan Bakery for 10 years and then at Wonder Bread Bakery for 2 years. After leaving Wonder Bread, he was a truckdriver for 1 to 1 1/2 years and then self-employed as a siding applicator for 25 years. Kalhorn quit the siding business in 1983 when he was hired by the City of Bellevue as a maintenance mechanic. He worked in the latter capacity until he quit in December of 1986. This was because of his inability to perform some of the jobs that he could perform prior to his injury. Kalhorn testified he was told by his supervisors that because of his injury, he could not perform the job that he was hired to do. He said he was told that he would be better off to "get out." Kalhorn claimed he was given jobs such as raking the yard with a hand rake, pushing a broom, and cleaning engines as a result of his inability to do the jobs for which he was originally hired. Kalhorn felt that he was unable to return to the siding business due to dust from the saw work required. A constant companion would be needed to do the sawing tasks, the plaintiff testified. Kalhorn declared he would not even try to return to a previous job as an over-the-road trucker because of the glare and light sensitivity in his eye. He did not feel that he could safely handle a truck on the road.

The compensation court was not clearly wrong in determining that Kalhorn was unable to return to work in which he was previously skilled. The order of the Workers'

Compensation Court is correct in every respect and is affirmed.

Because the City of Bellevue has failed to reduce the award after rehearing, Kalhorn is allowed $2,000 for services of his attorney in this court. See Neb. Rev. Stat. § 48-125 (Cum. Supp. 1986).

AFFIRMED.