RAY HOFFART, APPELLANT, V.
FLEMING COMPANIES, INC., APPELLEE.
634 N.W.2d 37

Filed September 4, 2001. No. A-00-1185.

Joseph C. Dowding, of Dowding, Dowding & Dowding, for appellant.

Patrick B. Donahue, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

Irwin, Chief Judge, and Sievers and Carlson, Judges.

Sievers, Judge.

Ray Hoffart appeals an award from the Workers' Compensation Court, arguing that the court erred in awarding a partial permanent impairment rating for his frostbitten foot without considering the effect of cold on his foot. Hoffart also appeals the denial of his request for reimbursement of relocation expenses he incurred in moving to a state with a warmer climate, a permanent move he made upon his doctor's recommendation.

## BACKGROUND

In 1997, Hoffart was employed by Fleming Companies, Inc. (Fleming), as a grocery selector in the dry goods department in Fleming's warehouse in Lincoln, Nebraska. On March 25, he traded shifts with a coworker who worked in the freezer department. On that day, Hoffart was wearing the steel-toed tennis shoes he wore every day at his job. Hoffart worked in the freezer from 1 to 6 p.m., when he began experiencing a knifing pain in his right foot which caused him to limp. Hoffart worked the full shift that day, leaving at 9:30 p.m. He had the next day off from work, but

returned on March 27. After an hour of constant, knifing foot pain, a supervisor instructed him to seek medical treatment.

Hoffart's toes and the ball of his right foot had turned black; he was diagnosed with frostbite and treated for a suspected infection. Hoffart's doctor, Dr. Janet Wolfe, referred him to Dr. David Voigt. After Hoffart's first appointment on April 11, 1997, Dr. Voigt wrote a letter to Dr. Wolfe, reporting that Hoffart suffered from a significant cold injury to his great toe and minor cold injury to the other toes and forefoot of his right foot. Dr. Voigt mentioned in the letter that the cold injury might be a permanent condition and that Hoffart must learn to care for a neuropathic foot that would be hypersensitive and painful, especially in cold weather. Hoffart saw Dr. Voigt again on April 18 to have his great, second, and fourth toes debrided. Dr. Voigt wrote another letter to Dr. Wolfe, reporting the treatment he provided and stating that Hoffart's frostbite was healed, but that his toes still felt a bit cold. Dr. Voigt said that he anticipated that Hoffart's condition would improve over time, but that it was possible that Hoffart might never fully recover from the injury.

Hoffart was off work for about 4 weeks and received workers' compensation benefits during that time. When he returned, Hoffart worked full time in the grocery department. He spent about 6 months working in the meat and dairy area where temperatures stay below 50 degrees. Hoffart continued to experience pain he described as a feeling of needles poking into his foot. Every 2 hours, he needed to sit down to relieve the pressure on his foot. For the next 1½ years, Hoffart was assigned to the dry goods area, where he was not exposed to cold temperatures. However, he still needed to frequently sit down.

On December 9, 1998, Hoffart returned to see Dr. Voigt, seeking a permanent release from working in the cold. Hoffart complained that his foot still hurt when exposed to cold temperatures. Dr. Voigt performed arterial Doppler studies to determine the blood flow impairment to Hoffart's right foot. According to Dr. Voigt's history and physical report, he prescribed Procardia XL to increase blood flow to Hoffart's right foot and combat vasospasm. Hoffart saw Dr. Voigt again on January 4, 1999. Dr. Voigt increased Hoffart's Procardia dosage and scheduled an appointment for the next month. If the Procardia proved ineffective, he

would try another blocking agent. Dr. Voigt ended his report by writing that Hoffart might need to move to a warmer climate.

On February 15, 1999, Dr. Voigt provided Hoffart with his requested "impairment rating" in a letter explaining that in arriving at his rating, he consulted the "American Medical Association Guide to the Evaluation of Permanent Impairment." Dr. Voigt mentioned that the arterial Doppler studies showed some improvement in blood flow after Hoffart began using Procardia, but that the blood flow was not normal, indicating that Hoffart suffered a vascular injury as well as a peripheral neural injury. Dr. Voigt found that Hoffart suffered a "class IV" impairment due to the vascular injury. He ultimately opined that Hoffart's foot injury "calculates to be 82% disability." Dr. Voigt wrote that he anticipated that Hoffart would suffer chronic pain, as frostbite causes a progressive vasculitis, and that he would need to take calcium channel blockers the rest of his life. Dr. Voigt stated that Hoffart's permanent physical restriction is avoidance of cold temperatures.

Fleming's insurance company requested that Dr. Scott McMullen assess Hoffart's condition to determine the partial permanent impairment rating for his right foot. Dr. McMullen wrote that he did not believe that Hoffart's pain was related to vascular ischemia, but that a report showing change in vascular status following use of Procardia did exist. Dr. McMullen rated Hoffart's vascular status as "Class I." Dr. McMullen explained that he referred to the same guide used by Dr. Voigt to arrive at a 24-percent impairment rating for Hoffart's right foot.

Dr. Voigt saw Hoffart again in May and June 1999, and discussed the possibility of Hoffart's moving to a warm climate. At the end of the June appointment, Dr. Voigt gave Hoffart a permanent release from working in temperatures below 50 degrees and sent a letter to Hoffart's attorney with his recommendation that Hoffart move to a warm climate. Hoffart stopped working at Fleming in June and moved to North Carolina, where his brother lives. He is employed by Simmons Mattress Company in the shipping department. Hoffart works in a temperate warehouse; however, he still must stop and sit every couple of hours when it becomes uncomfortable for him to walk. Hoffart seeks moving expenses totaling $1,604.21, which include gas, hotels, and food.

In July 1999, Dr. Chet Paul, Dr. Voigt's colleague, sent a letter to Hoffart concurring with Dr. Voigt's recommendation that Hoffart move to a warmer climate in order to prevent the possibility of ulceration, pain, and loss of digits from his right foot. An independent medical examiner assigned by the Workers' Compensation Court, Dr. Donald Bell, reported in a response form dated July 16 that Hoffart suffered no vascular compromise in a "non-cold" environment. Dr. Bell reported his findings in a letter sent to Fleming's insurance carrier, in which he stated that Hoffart had achieved his maximum medical improvement. In the letter, Dr. Bell wrote that he agreed with Dr. McMullen's assessment that Hoffart suffered only a 24- to 25-percent partial permanent impairment, saying that he believed Hoffart suffered an almost total neurological deficit that was not limiting in the absence of cold exposure. Dr. Bell was deposed February 11, 2000, and explained his reasoning for his partial permanent impairment rating of Hoffart's right foot. Dr. Bell testified that he believed Hoffart suffered vascular impairment, but only in a cold environment. Further, Dr. Bell stated that Hoffart's vascular impairment might not be permanent because his vasospasms in cold environments might cease. Dr. Bell explained that he opted not to test Hoffart in a "pathologic state" using the cold testing Dr. Voigt performed because the testing itself causes a form of injury, plus, he had reviewed Dr. Voigt's test results before arriving at his conclusions.

In response to the reports from Drs. Bell and McMullen, Dr. Voigt stated that his review of the documents revealed that the doctors did not perform any invasive vascular studies or stress vascular studies. Dr. Voigt opined that his studies—in which he placed Hoffart on a treadmill, cooled his leg, and performed Doppler studies—were more reliable and exact in diagnosing vasospastic disease. He concluded that in the absence of these studies, one will not see the injury or reproduce the symptoms the patient reports. Therefore, in Dr. Voigt's opinion, his estimation of disability "stands."

Hoffart filed a petition against Fleming with the Workers' Compensation Court on April 23, 1999. In relevant part, he sought temporary total and/or partial disability, permanent partial and/or total disability, and future medical expenses. A hearing was held February 17, 2000, and the trial judge entered an award

on April 27, finding that Hoffart suffered a "50 percent loss of use of his right foot."

The trial judge further found that Hoffart's move to North Carolina was undertaken to relieve the pain he felt when his right foot was exposed to cold temperatures. However, because the move was not made pursuant to a rehabilitation plan, the judge found that Hoffart's moving expenses were not compensable. The judge also noted that Hoffart had requested payment of the moving expenses under Neb. Rev. Stat. § 48-120 (Reissue 1998), which the judge said provides that the "employer is liable for medical, surgical, and hospital services, appliances, supplies, as and when needed which are required by the nature of the injury and which relieve pain or promote and hasten the employee's restoration to health and employment." The judge concluded that Hoffart made a permanent move after he reached maximum medical recovery and that the move relieved his pain and hastened his restoration to health and continued employment when it was reasonably certain that Hoffart could not continue his employment in Nebraska. Although the judge recognized that the Nebraska Workers' Compensation Act is to be liberally construed, and the purpose of the act is to get the employee back to work and keep the employee at work, the judge found that the expenses of a permanent move are not ongoing medical expenses and are not contemplated within § 48-120.

Fleming appealed the award to the Workers' Compensation Court review panel on May 10, 2000. An order of affirmance, in part, and reversal, in part, on review was entered by the panel on October 16. In addressing Hoffart's cross-appeal, the panel found that the trial judge was not clearly wrong in finding that Hoffart suffered a 50-percent partial permanent disability in his right foot, as evidence exists in the record to support the trial judge's decision. The panel also agreed with the trial judge's finding that reimbursement of moving expenses are not contemplated under § 48-120 and affirmed the decision rejecting the compensability of Hoffart's moving expenses. Hoffart appealed to this court.

## ASSIGNMENTS OF ERROR

Hoffart assigns error to the review panel's failure to award an 82-percent partial permanent impairment rating of his frostbitten

right foot. Hoffart also assigns as error the decision that Fleming need not pay his moving expenses for relocation to a warmer climate.

## STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Guico v. Excel Corp.*, 260 Neb. 712, 619 N.W.2d 470 (2000); *Haro v. Beef America*, 9 Neb. App. 957, 622 N.W.2d 170 (2001).

In determining whether to affirm, modify, reverse, or set aside a judgment of a Workers' Compensation Court review panel, a higher appellate court reviews the findings of the single judge who conducted the original hearing; the findings of the single judge will not be disturbed on appeal unless clearly wrong. *Guico v. Excel Corp., supra.* Regarding questions of law, an appellate court in workers' compensation cases is obligated to make its own determinations. *Id.*; *Haro v. Beef America, supra.*

## ANALYSIS

### Partial Permanent Impairment Rating.

Hoffart argues that his partial permanent impairment rating should reflect that in cold weather he suffers a vascular compromise which results in more impairment than present in warm weather. He cites *Kalhorn v. City of Bellevue*, 227 Neb. 880, 420 N.W.2d 713 (1988), which he says advances the proposition that a plaintiff's partial permanent disability benefits should be calculated upon the condition of an employee's injury in its uncorrected state. In *Kalhorn*, an employee injured his eye at work. The employee's damaged lens was replaced by a synthetic intraocular lens implanted to prevent the formation of a cataract that would have robbed the employee of vision. The Workers' Compensation Court based disability benefits upon the employee's uncorrected vision because the lens implant was not fully corrective and created ongoing problems in the form of blurred vision and headaches.

Hoffart says that by moving to a warmer environment, he is simply taking corrective measures, such as "placing a band-aid on his foot" or "glasses on a bad eye." Brief for appellant at 7. Hoffart argues that his partial permanent disability rating should be based upon the condition of his right foot in a cold environment, in order to avoid "ruling out" from his rating the vascular compromise he experiences in cold temperatures. However, relocation is not the same as medical implantation of a corrective device in the body, and thus, *Kalhorn* does not control the result. In any event, we see the level of permanent impairment as a question of fact, not law.

Reports assessing Hoffart's impairment of his right foot were provided by Dr. Voigt, Hoffart's doctor, and by Dr. McMullen, Fleming's designated physician. Dr. Voigt reported an 82-percent impairment rating of the foot, whereas Dr. McMullen reported a 24-percent rating. After reviewing the reports of the medical experts, the trial judge found that Hoffart suffered a 50-percent "loss of use" of his right foot.

Whether a claimant has sustained permanent impairment and the extent of impairment are questions of fact. See *Crouch v. Goodyear Tire & Rubber Co.*, 255 Neb. 128, 582 N.W.2d 356 (1998). If the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court, an appellate court is precluded from substituting its view of the facts for that of the Workers' Compensation Court. *Guico v. Excel Corp.*, 260 Neb. 712, 619 N.W.2d 470 (2000); *Haro v. Beef America*, 9 Neb. App. 957, 622 N.W.2d 170 (2001). The findings of the single judge will not be disturbed on appeal unless clearly wrong. *Guico v. Excel Corp., supra.*

Here, the record reveals that the court did not adopt either Dr. Voigt's or Dr. McMullen's opinion as to Hoffart's partial permanent impairment rating of his right foot. The court did not explain why it chose a 50-percent "loss of use" rating. Nonetheless, evidence in the record shows that Dr. Voigt's 82-percent rating was based upon results from a "cold test" that Dr. McMullen did not use in reaching his 24-percent rating. Dr. Bell, the court-appointed physician, explained in his deposition that although he did not conduct this test either, he took the results of Dr. Voigt's test into account before deciding that a

24- to 25-percent rating was appropriate. Dr. Bell stated that although Hoffart suffered vascular compromise in a cold environment, that condition might be temporary and that Hoffart did not suffer vascular impairment in a warm environment. Dr. Bell further stated that although an 82-percent rating was appropriate when Hoffart was exposed to cold temperatures, if Hoffart avoided the cold, that rating was "way out of line." Dr. Bell testified that he arrived at the 24- to 25-percent rating because in a warm climate Hoffart suffered no vascular compromise. Based upon our review of the record, we cannot say that the court was clearly wrong in finding that Hoffart suffered a 50-percent "loss of use" of his right foot. Moreover, where the record presents nothing more than conflicting medical testimony, an appellate court will not substitute its judgment for that of the Workers' Compensation Court trial judge. *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999). There was no error in the trial judge's finding concerning permanent impairment.

*Reimbursement of Moving Expenses.*
    Hoffart contends that the "clear language" of § 48-120 provides that his relocation expenses are compensable. Section 48-120 provides:

> The employer shall be liable for all reasonable medical, surgical, and hospital services . . . appliances, supplies, prosthetic devices, and medicines as and when needed, which are required by the nature of the injury and which will relieve pain or promote and hasten the employee's restoration to health and employment . . . .

Hoffart argues that his moving expenses should be reimbursed under the Nebraska Workers' Compensation Act because the Supreme Court has consistently held that the terms of the act are to be broadly construed to accomplish the beneficent purpose of the act. *Logsdon v. ISCO Co.*, 260 Neb. 624, 618 N.W.2d 667 (2000); *Anderson v. Omaha Pub. Sch. Dist.*, 254 Neb. 1007, 581 N.W.2d 424 (1998).
    ■ Hoffart recognizes that the Nebraska appellate courts have not directly addressed whether an injured worker should be reimbursed for the relocation costs of moving to a warmer climate when the relocation is undertaken upon a doctor's

recommendation due to a work injury. However, Hoffart relies upon *Newberry v. Youngs*, 163 Neb. 397, 80 N.W.2d 165 (1956), where the Supreme Court held that under § 48-120, an employer is liable for the costs of travel incident to and reasonably necessary to obtain reasonable medical and hospital services. In *Newberry*, the worker had to travel to medical providers to receive a special shoe to relieve his pain. The court in *Newberry* noted that § 48-120 specifically states that the employer is liable for reasonable medical and hospital services. Therefore, the court held that travel "incident to and reasonably necessary" to obtain those services is compensable. *Id.* at 404, 80 N.W.2d at 170. This rule is now firmly established. Hoffart extrapolates the holding from *Newberry* to his situation. He argues that travel reasonably necessary to obtain medical services should encompass relocation to a warmer environment when the relocation is prescribed by a doctor to relieve pain, hasten the employee's restoration to health and employment, and avoid additional injury which stems from the original injury.

Hoffart also directs our attention to *Koterzina v. Copple Chevrolet*, 1 Neb. App. 1000, 510 N.W.2d 467 (1993), where we ordered reimbursement of construction expenses incurred in making the plaintiff's home handicapped-accessible. We determined that the improvements were an appliance or supply which "relieve pain or promote and hasten the employee's restoration to health and employment." See § 48-120. We also note an instance of obviously liberal construction of the term "devices" under § 48-120 which are compensable when their purpose is to relieve pain. See *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990) (cost of penile implant found compensable as prosthetic device to relieve pain, i.e., mental anguish).

The trial judge noted in his decision here that "[o]ther states have held that a permanent move to a new location are not covered by that state's workers' compensation statute," citing *Stritt v. State Ins. Fund*, 37 Or. App. 893, 588 P.2d 136 (1978). In *Stritt*, the Oregon court refused to award an employee the costs of a permanent move recommended by the employee's doctor. The *Stritt* court stated that under a statute providing reimbursement for medical services, an employee would be entitled to travel expenses required for the employee to undergo a temporary,

medically prescribed course of treatment. An employee would not be entitled to expenses related to making a permanent move, even if the move was occasioned in whole or in part by a compensable injury. *Id.* In so finding, the *Stritt* court distinguished two cases advanced here by Hoffart, *Levenson's Case*, 346 Mass. 508, 194 N.E.2d 103 (1963), and *Clark v. Fedders-Quigan Corp. et al.*, 284 A.D. 430, 131 N.Y.S.2d 575 (1954). The *Stritt* court noted that in these cases, the claimants were advised by doctors to travel to Florida to seasonally alleviate the symptoms of each claimant's compensable injury. The claimants in *Levenson* and *Clark* sought transportation expenses rather than expenses resulting from permanent moves. At oral argument, Fleming's counsel seemed to acknowledge the potential for the compensability of seasonal travel expenses under these cases while maintaining that the permanency of the move here makes the expenses at issue noncompensable. However, it seems readily apparent that in terms of overall cost to the employee, a permanent move to alleviate symptoms is far more economical, and thus more reasonable, than repeated seasonal travel to avoid symptoms of a work-related injury.

Hoffart cites *Wilhelm v. Kern's Inc.*, 713 S.W.2d 67 (Tenn. 1986), where a schizophrenic patient (whose condition was due to a work injury) was "bored" in a Tennessee psychiatric facility and wished to be relocated to a suitable facility in Washington, D.C., where the patient had lived as a college student. The Tennessee Supreme Court denied the patient's request for reimbursement of travel expenses related to the relocation. The court found that under the relevant statute, travel expenses would be compensable only if the travel was "therapeutic in itself" or "necessary to enable the employee to acquire a 'reasonably required' medical, surgical, dental or nursing service." *Id.* at 68. Here, while the act of traveling to North Carolina cannot be seen as therapeutic by itself, the undisputed medical evidence is that relocating to a warmer climate has a number of therapeutic benefits. While denying the travel expenses, the *Wilhelm* court found that the costs of living in a " 'half-way house' " in Washington, D.C., were compensable medical or nursing expenses because the plaintiff would need those services due to his condition, regardless of where he lived. *Id.* at

69. In our view, *Wilhelm* is factually a very different case from that before us, but it nonetheless illustrates that we should not ignore the therapeutic purpose of the move, and as previously noted, moving is more economical than seasonal travel.

There are few "pure" relocation cases. In *Decker v. City of West Palm Beach*, 379 So. 2d 1004 (Fla. App. 1980), the claimant sought relocation expenses from Florida to North Carolina, a move he made upon his psychiatrist's advice. The psychiatrist testified that the move was necessary to treat the claimant's mixed anxiety depressive neurosis, but the court denied the claimant's request for relocation expenses. The court stated that there was no showing that a move to North Carolina (where his in-laws were moving) was reasonable or necessary for the claimant's treatment, even assuming that relocation may be considered remedial treatment. However, *Decker* is not on point because it does not have the causal connection between the claimant's injury, his symptoms, and the new location that is revealed by the evidence here. Hoffart sustained a cold injury, and Nebraska has cold winters which significantly increase Hoffart's pain and put him at risk for further injury from cold due to decreased sensitivity and circulation. All of the doctors agree that living in a warm climate will relieve pain and reduce future risk—which makes Hoffart a more functional worker.

The tight causal connection between injury, residual effects of the injury, and a warmer climate, coupled with our duty to liberally construe the Nebraska Workers' Compensation Act to accomplish its beneficent purpose, *Logsdon v. ISCO Co.*, 260 Neb. 624, 618 N.W.2d 667 (2000), compels us to conclude that the Workers' Compensation Court erred in finding the moving expenses noncompensable.

In reaching this conclusion, we remember that travel necessary for medical treatment is clearly compensable. Thus, relocation expenses, pursuant to a doctor's recommendations, in order to lessen necessary medical treatment, additional injury, and pain are within a liberal definition of "medical services" under § 48-120, so that the Nebraska Workers' Compensation Act can accomplish its beneficent purposes. We have not ignored Fleming's argument that such an award is the proverbial "slippery slope." Instead, we have focused on the unique facts

presented by the nature of a cold injury, the resulting pain and susceptibility to additional injury from living in a cold climate, and the undisputed benefit of relocating.

By analogy, the doctors' advice to move and the associated costs seem to be the functional equivalent of a prescription for pain medicine, only here it is only a one-time expense; whereas, traditional pain medicine prescriptions can be lifelong, but nonetheless compensable. Given the undisputed nature of the evidence, the compensability of relocating was essentially a question of law, upon which the trial judge and review panel erred. However, having rejected the compensability of the expenses as a legal matter, the trial judge never reached the factual question of whether the expenses were reasonable. Thus, we reverse the denial of benefits for relocation, but remand the issue to the review panel so that it can order the trial judge to determine, on the record already made, whether the expenses sought to be recovered were reasonable.

## ATTORNEY FEES

Hoffart's counsel has moved for an award of attorney fees and has filed a supporting affidavit showing a fee of $3,675.05. While Hoffart succeeded on his appeal concerning the expense of relocation, he did not succeed with respect to the percentage of impairment awarded. Therefore, we award attorney fees in the amount of $1,525.

## CONCLUSION

The Workers' Compensation Court was not clearly wrong in finding that Hoffart suffered a 50-percent partial permanent impairment rating of his frostbitten right foot. The court erred in finding Hoffart's relocation expenses to North Carolina noncompensable, but the question of the reasonableness of the tendered expenses remains to be addressed by the trial court.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.